CHARLES MARKIEWICZ V. STATE OF NEBRASKA.

FILED DECEMBER 30, 1922.   No. 22681.

1.  Criminal Law:  INTERPRETER.  In a prosecution for murder, where
    it is suggested to the court that the defendant did not under-
    stand the English language and desired an interpreter to in-
    terpret to him the evidence of the various witnesses as it was
    introduced and the things said and done at the trial, and where
    the court appointed an interpreter for that declared purpose, who
    was admittedly competent, held, that there was no affirmative
    duty on the part of the court to watch over and require the
    interpreter to translate to the defendant all that was being said.

2.  ———:  ———.  Where the defendant, furnished with such an
    interpreter, makes a showing after conviction that the inter-
    preter did not interpret to him the testimony of the witnesses,
    and that he did not understand what transpired during the
    trial, and where he has had a fair opportunity, as he does
    have when such interpreter is furnished, to apprise himself
    as to the course of the testimony, so as to enable him, through
    his attorney, to properly cross-examine and reply to the wit-
    nesses, and where the witnesses are called and testify in
    his presence, it cannot be said that he has not been legally
    confronted by such witnesses, as is required by the Constitu-

tion of this state, from the mere fact that he has failed to understand them.

3. ———: WITNESSES: FEDERAL GUARANTY. The guaranty found in the federal Constitution, that persons accused of crime shall be confronted by the witnesses against them, applies to prosecutions in the federal courts only, and not to those in the state courts.

4. ———: INSTRUCTIONS: FALSUS IN UNO, FALSUS IN OMNIBUS. Where the condition of the testimony is such as to justify and require the giving of an instruction, based upon the maxim "Falsus in uno, falsus in omnibus," the court should give it. Such an instruction is, however, not required in all cases, but only where, from the evidence, the jury may be justified in believing that a witness has wilfully and corruptly testified to a falsehood, and, further, where the same witness has testified as to some other material issue in the case than that upon which he is directly impeached.

5. ———:  ———: DUTY OF COMPLAINANT. Where a defendant predicates error on the refusal of the court to give such an instruction, it is incumbent upon him to specifically point out that there is such a peculiar condition in the record as to warrant the instruction, and to designate to what material testimony he believes the maxim should have been applied.

6. ———: CAUTIONARY INSTRUCTION. An instruction, warning the jury to exercise greater care in weighing the testimony of police officers and detectives, is not rendered erroneous where the court adds: "This does not mean, by any means, however, that such officers should necessarily be disbelieved, but only that in weighing their testimony such caution as above described should be observed."

7. ———: INSTRUCTIONS. Other instructions examined, and held to be free from prejudicial error.

8. Evidence examined, and held sufficient to support the verdict of murder in the first degree.

ERROR to the district court for Douglas county: ALEXANDER C. TROUP, JUDGE. Affirmed.

Jamieson, O'Sullivan & Southard and Irvin Stalmaster, for plaintiff in error.

Clarence A. Davis, Attorney General, and C. L. Dort, contra.

Heard before MORRISSEY, C. J., LETTON, DEAN and FLANSBURG, JJ., REDICK and SHEPHERD, District Judges.

FLANSBURG, J.

The defendant was convicted of murder in the first degree and sentenced to life-imprisonment. He interposed the plea of self-defense. It is his contention that the evidence shows the killing took place upon a sudden quarrel, and does not, in any event, justify a conviction of any greater offense than manslaughter.

The defendant was a Polander, having been born in Poland, Russia, and could speak very little in the English language. On December 17, 1921, he went to the barber shop of deceased, in Omaha. The deceased offered to sell him a drink. Defendant stated that he had a 20-dollar bill only. This the deceased offered to change for him. The defendant took a drink of whisky, for which it was agreed he should pay 50 cents. The deceased took the bill, but refused to return any change, saying that the defendant could take the balance out in drinks. After a time both parties left the barber shop. The deceased went to a soft-drink parlor a few doors away. The defendant, some 15 or 20 minutes later, entered the soft-drink parlor. There is evidence to show that just before entering he drew an automatic revolver, and that as he entered the door with the revolver in his hand he said, "I kill," and mumbled something further which the witness could not understand. There were a number of people in the soft-drink parlor, most of them Russians, and who could not converse well in the Polish language. The defendant was a foreigner among them. When he entered the room the deceased was standing about halfway back toward the further end of the room, the room being about 60 feet in length, and was eating a sandwich at the counter. He was unarmed. There is evidence to show that when the defendant approached within some eight or ten feet of the deceased he said something about wanting his money and immediately began

firing. Three shots were fired in the room. Two of the bullets thus fired were found lodged in the wall, beyond where the deceased was at that time standing, and each of them struck at a height of about seven feet from the floor. As the first of the three shots was fired the deceased doubled up, throwing both hands to his stomach, and then turned and ran towards the back door. He was followed by defendant some four or five feet distant behind him. Back of the building these two were heard scuffling, but there is no eye-witness, other than the defendant, as to what took place there. Four more shots were fired during that time. Shortly afterwards the defendant appeared in the doorway, being pushed by the deceased, who was holding the right hand of the defendant, which hand held the revolver. The revolver, a 25-caliber automatic, was taken from the defendant and a box of cartridges was found upon his person. The deceased was helped into the room and placed upon the floor, where he soon expired. It was found that he had been struck by four bullets; one, as if shot partly from the front, entered deceased's abdomen a little left of the navel, and took a downward course, lodging in the groin; another entered his left side about midway between the hip and the shoulder and a little towards his back, this passed through his body, penetrating the stomach and liver; another, as if shot from a position to the left of the deceased, passed through his left arm and grazed, but did not enter, his body; and still another struck him near the left cheek-bone and came out near his left ear. The defendant, after the shooting, was made to sit in a chair. He said, "That man is no good." He was later taken to the police station, where, it is said, he was asked why he had killed the deceased, and he shrugged his shoulders and answered: "What for he took my $20."

The defendant's testimony was that he carried the revolver because he was afraid to leave it at home where his children might get it. He related the altercation with the deceased at the barber shop, much as described

by the state's witnesses, but his testimony is that, when he entered the soft-drink parlor and approached the deceased and asked for his money, the deceased struck and began fighting him, and that during that struggle defendant loaded his revolver and shot into the floor and then into the ceiling, not attempting to hit the deceased, that he followed the deceased through the back door of the building where the struggle continued, the deceased continuing to strike him and he shooting in self-defense, all the time fearing that the deceased was about to take his life. There is a conflict of testimony as to whether the defendant appeared to have received any bruises during the struggle. Some of the state's witnesses said that his face was bleeding when he reentered the room after the struggle, and that his clothes were torn, and his eye bruised, as if he had been struck there. Other witnesses denied these facts.

The jury believed the testimony of the state's witnesses as to the nature and character of the attack made by the defendant, and, without further detailing the testimony, except as above outlined, though we have carefully examined it, we feel that there can be no question but that the evidence is sufficient to support the conviction of murder in the first degree. The testimony on behalf of the state shows a quarrel, a separation of the parties, and an interval of some 15 or 20 minutes, in which the defendant was thinking over his grievance. There is enough to show a deliberate, premeditated determination, actuated by the spirit of revenge, on the part of the defendant, to take the law into his own hands, and, should the deceased continue to wrong him in refusing to return the money, to take the deceased's life.

The defendant did not speak or understand the English language, and assigns as a ground of error that the testimony of the various witnesses, as it was introduced, was not interpreted to him, nor the statements of court and counsel explained to him during the progress of the trial, and that his trial was, therefore, conducted in violation

of the Constitution of the United States and of the state of Nebraska, in that he was not legally confronted with the witnesses against him.

At the commencement of the trial suggestion was made that the defendant did not understand the English language, and that he should be furnished an interpreter to interpret the evidence as given and to explain the things said and done during the proceeding. The court thereupon appointed an interpreter, who was admittedly competent, and who was the person selected by the defendant himself. This interpreter sat throughout the trial at the side of the defendant. After conviction the defendant, in support of a motion for a new trial, presented an affidavit, setting forth that he did not understand the testimony of the witnesses, nor the various steps taken and things done during the trial, and that the interpreter had not interpreted nor explained any of these things to him. While the defendant was upon the witness-stand himself, however, the interpreter did serve, and translated all questions put and answers given.

There is no provision either in the Constitution or statutes of this state, which expressly provides that the court shall see to it that all testimony given in a criminal trial shall be interpreted to the accused in language that he understands. Though it is the duty and province of a court to see that a witness comprehends all questions asked, in order that such questions may be answered understandingly, and must provide an interpreter for that purpose where, in the court's discretion, one is necessary, that rule does not satisfy the *quære* of whether or not the court is required to furnish an interpreter to interpret to the defendant all of the testimony of the various witnesses as it is given during the trial. *Livar v. State,* 26 Tex. App. 115.

The defendant bases his claim, that the court was bound to see that all the testimony was interpreted to him as it was introduced, entirely upon those provisions in the state and federal Constitutions which declare that

the defendant in a criminal case shall have the right to be confronted with the witnesses against him. The guaranty found in the federal Constitution, that persons accused of crime shall be confronted by the witnesses against them, applies to prosecutions in the federal courts only, and not to those in the state courts. *West v. Louisiana*, 194 U. S. 258; 16 C. J. 836, sec. 2112.

The defendant argues that he is not confronted with the witnesses in the legal sense of that term, where he is not made to understand their testimony as it is given. In *Mattox v. United States*, 156 U. S. 237, it is said: "The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

Though the court must accord the defendant full opportunity to obtain all the benefit of this constitutional right and, to that end, to understand the testimony of the witnesses against him, so that a proper cross-examination may be had, we know of no affirmative duty devolving on the court to see that the defendant does have interpreted to him everything that is said and done, as it occurs, during the progress of the trial. The court in this case surely performed its full duty of preserving to the defendant his rights in that regard by appointing the interpreter selected by the defendant, an interpreter who was admittedly competent, and who was appointed for the declared purpose of interpreting and explaining to the defendant all of the things said and done during the trial. The defendant and his attorney were furnished the means by which the defendant could be fully apprised

with knowledge of the proceedings and the course of the testimony, and it was for them to determine how far they should avail themselves of the services of the inter-preter furnished.  The defendant having been actually confronted by the witnesses face to face as they gave their testimony, and having been given the means and a fair opportunity to understand what they said, and of preparing himself, through his attorney, to have the wit-nesses properly cross-examined, certainly has been denied no constitutional right, from the mere fact that the court did not, as the evidence was introduced, watch over and require the interpreter to constantly translate to the defendant all that was being said.  See *Ralph v. State,* 124 Ga. 81, 2 L. R. A. n. s. 509.; *Regina v. Yscuado,* 6 Cox's Crim. Law (Eng.) 386.

Error is predicated on the refusal of the trial court to give an instruction tendered by the defendant, based upon the maxim *"Falsus in uno, falsus in omnibus."* The form of the instruction tendered is not questioned.  It advised the jury that, should they believe from the evi-dence that any witness in the case had wilfully testified falsely as to any material facts in the case, then they were at liberty to disregard all of the testimony of any such witness, save such testimony as they might find corroborated by the testimony of other credible wit-nesses.

Where the condition of the testimony is such as to require the giving of such an instruction, it has been held that the refusal of the court to give it, when prop-erly tendered, is reversible error.  *Barber v. State,* 75 Neb. 543; *Titterington v. State,* 75 Neb. 153.  And see 16 C. J. 1017, sec. 2442.  The evidence to which the instruc-tion was particularly applicable in the cases just cited is not discussed in the opinions.  It is only stated there that there was a serious conflict in the testimony as between certain witnesses.  We do not believe in every case, where there is merely a conflict of testimony, that the court is required to give the instruction in question.  In most of

the decisions, where the refusal to give the instruction has been held reversible error, there was certain direct evidence to show that some witness had wilfully and corruptly testified, either by contradictory statements made by himself while on the witness-stand, or where his testimony was impeached by other witnesses who testified to the making of such contradictory statements made by him elsewhere. *Reynolds v. State,* 196 Ala. 586; *Plummer v. State,* 111 Ga. 839; *Owens v. State,* 80 Miss. 499; *State v. Dwire,* 25 Mo. 553. Of course, in many cases the conflict between the testimony of certain witnesses is alone sufficient to show that one of the witnesses has wilfully sworn to a falsehood.

Where the defendant bases error on the refusal to give such an instruction, he must, by his bill of exceptions, show that the peculiar condition of the testimony required the giving of it. *State, v. Allen,* 111 La. 154.

Where the testimony is such as to show that a particular witness has wilfully and corruptly testified falsely to certain particular matters, and has also given testimony on certain other material issues in the case, upon which he has not likewise been directly impeached, it is plain that such an instruction would be of particular benefit to the opposing party. It is obvious, however, that such an instruction would not be applicable to every case where there is a conflict between the testimony of a witness on one side, and the testimony of a witness on the other, for, though there be evidence to show that a certain witness has testified falsely on a particular issue, still, if his testimony is confined to that issue and he has not testified to other material facts in the case, upon which he is not, to the same degree, directly contradicted or impeached, then, should the jury disbelieve him as to the testimony which he has given, they would not be called upon to disregard his testimony on some other issues, for there would be no such testimony in the record to disregard. In the absence of such a peculiar condition of the testimony, requiring the giving of the instruction, it

would, if given, be of no additional aid to the jury or benefit to the accused, where the jury is given the full and general instruction covering their right and power to weigh testimony, and to act as sole judges of the credibility of witnesses. Such a general instruction was given in this case.

In *Milton v. Holtzman*, 216 S. W. (Mo. App.) 828, the Missouri court has gone so far as to lay down the rule that, in any case, "Such instruction is 'nothing more than an affirmative declaration of the power possessed by the jury in determining the credibility of witnesses.' *State v. Barnes*, 274 Mo. 625. And it may well be presumed that a jury will not hesitate to exercise that power, if the circumstances warrant it, without being specifically told that they may do so." See, also, *Thompson v. Portland Hotel Co.*, 209 Mo. App. 476; *State v. Barnes*, 274 Mo. 625; *State v. Banks*, 40 La. Ann. 736; *State v. McDevitt*, 69 Ia. 549.

It is true that there was a direct and serious conflict in the testimony in this case between that of the defendant and that offered by the state's witnesses relating to the main issues in controversy. It is manifest from a reading of the record that either the defendant or the state's witnesses testified to a falsehood, but, viewing the testimony of the state's witnesses alone, there is little substantial contradiction among them. The defendant's counsel, let us emphasize, does not point out in his brief any particular testimony on the part of any of the state's witnesses to which he wishes to apply the maxim. In oral argument he did mention the testimony of the 15-year-old boy, who testified that he saw the defendant, about 100 feet from the soft-drink parlor, after having left the barber shop, go up the street in the direction of the defendant's home, and that he saw him return in about 10 minutes. This boy also was the witness who testified that the defendant drew his gun from his pocket just before entering the soft-drink parlor. No witness corroborates the boy in either of these particulars, and

the defendant contradicts him in both.  Counsel argues
that the boy's story that the defendant went home and
returned is unbelievable, for the defendant's home was
17 blocks away and defendant could not have made the
trip in the time specified by the boy.  The boy, however,
could easily have been mistaken as to the lapse of time,
and, moreover, he did not attempt to testify as to where
the defendant had gone, simply that he went up the
street and later returned.  There is nothing to show
that the boy purposely testified to a falsehood, unless
the jury should believe the defendant's statements made
in contradiction to him, and, if the jury did so believe
them, the boy's testimony would have been disbelieved
in one particular as much as the other, the matter rest-
ing entirely upon the general question of the credibility
of the two respective witnesses.  Defendant's counsel,
aside from what has just been mentioned, does not point
out that any particular witness testified falsely, and that
there was evidence to show that his testimony was wil-
fully and corruptly given upon that issue, and that such
witness also gave testimony upon some other material
issue in the case than that upon which he was impeached
and which might have been disregarded by the jury under
the instruction asked for.  We therefore do not see but
that the general instruction given by the court, advising
the jurors as to their power to weigh the testimony and
determine the credibility of the witnesses, adequately
covered the requirements of the case.

The court gave a cautionary instruction to the jury,
warning them to exercise a greater care in weighing the
testimony of police officers and detectives because of the
natual and unavoidable tendency of such persons to
procure and remember only such testimony as would be
against the defendant.  The defendant complains of this
instruction for the reason that the court added:  "This
does not mean, by any means, however, that such officers
should necessarily be disbelieved, but only that in weigh-
ing their testimony such caution as above described

should be observed." The instruction, as we view it, is entirely proper. The instruction is only intended to be cautionary, and the additional clause only makes that the more clear. To hold the converse of what was added to be true would be to utterly destroy and set at naught that particular kind of testimony.

Defendant assigns error on the ground of the refusal of the court to give an instruction tendered by him covering the matter of self-defense. By other instructions given by the court, that defense was fairly and adequately covered. It is claimed, however, that the instruction given by the court was not proper as not being based upon any reasonable theory of the evidence actually adduced at the trial, and was inconsistent. The instruction was as follows:

"Even though you should believe from the evidence that the deceased kept some money of defendant to which the defendant was entitled, as claimed by him, yet should you further believe from the evidence beyond a reasonable doubt that thereafter the defendant sought out the deceased and shot and killed him at a time and under circumstances when the defendant had no reasonable apprehension of immediate and impending serious injury to himself, and did so from a spirit of retaliation or revenge for the purpose of punishing the deceased for the alleged wrong done him in keeping his money, then the defendant cannot avail himself of the law of self-defense and you should not acquit him on that ground no matter how great the danger or imminent the peril to which defendant may have believed himself to have been exposed during the affray."

There was certainly a sufficient basis for the instruction in the evidence, and, in view of the evidence on behalf of the state upon which the instruction is premised, the final clause could only have referred to the affray which followed the defendant's initial attack. In view of other instructions on the law of self-defense and the condition of the evidence, the instruction could not have

been misleading, though not as clearly worded as it might have been.

A life sentence is perhaps a severe penalty in this case. The defendant, a poor laboring man, was subjected to the greatest provocation. The little money that he had was being wrongfully withheld by the deceased, whether or not with the intent of depriving him of it, at least for the purpose of tantalizing and enraging him. The defendant's mind became obsessed with the idea as evidenced by his demand: "Give me the rest of that back; I got childs and my woman was killed and I have to work for my childs." But the penalty is the minimum for the offense of which he was found guilty, and the court is without authority to reduce it.

The judgment of the lower court is therefore

AFFIRMED.