[Crim. No. 4713. Second Dist., Div. One. Jan. 8, 1953.]

THE PEOPLE, Respondent, v. VIOLET JOHN BERLING, Appellant.

Albert C. S. Ramsey and Milton Emlein for Appellant.

Edmund G. Brown, Attorney General, Norman H. Sokolow, Deputy Attorney General, S. Ernest Roll, District Attorney, and Thomas W. Cochran, Deputy District Attorney, for Respondent.

DORAN, J.—The appellant was charged with the murder of Kay Frances Erickson, a 10-year-old girl, who died at Long Beach on October 12, 1950. Appellant was an accordion teacher; the deceased child was studying under appellant's tutelage, and at the time in question was staying at appellant's studio. The trial commenced January 3, 1951, and ended on April 20, 1951. After eight days' deliberation a jury returned a verdict of murder in the first degree with recommendation of life imprisonment. A motion for new trial was argued and denied.

It appears from the record that Kay Frances was born on April 22, 1940, at San Pedro, entered kindergarten there, and at the age of five took dancing and piano lessons for eight or nine months. The family moved to Long Beach in July, 1947, where the girl resumed dancing lessons. In May, 1950, Mrs. Erickson took Kay Frances out of school because of a nervous stomach condition and because the teacher had advised that the girl was not going to pass. School teachers testified that Kay Frances was apparently a normal child in school, but somewhat immature, and had an I.Q. of 88 which was somewhat below normal. The school record noted that the child was "Artistic in singing and dancing."

About June 28, 1948, Mrs. Erickson conferred with Miguel Verdugo, an accordion teacher, and was referred to the appellant Violet Berling, a teacher of beginning students, with whom the mother arranged weekly lessons for Kay Frances at appellant's studio in Long Beach. Miguel Verdugo occupied a home in Long Beach, but shared a studio with appellant, Verdugo using the studio on Mondays. Appellant took Verdugo's phone calls and arranged appointments, while Verdugo paid bills connected with the studio.

At first Mrs. Erickson accompanied Kay Frances to appellant's studio and waited until the accordion lesson was completed; later the daughter was left there, sometimes all day

until as late as 10:30 p. m. Much of the time Mr. Erickson was unemployed and Mrs. Erickson worked to support the family. After March, 1949, the girl continued the accordion lessons without payment because of the parents' inability to pay. Some other students were also given free lessons by appellant.

A children's accordion quartette was formed, consisting of Kay Frances, and three other children, nine, eight and six years old, respectively. This quartette came to the studio to practice several times a week after school hours and spent the balance of the day and evening there. Sometimes one or more of the children stayed all night with appellant at the studio, all sleeping on the studio couch. Appellant bought the children gifts of clothing and toys, including gold wrist watches for Kay Frances and another pupil. The children were washed and generally taken care of, and were taken individually or as a group to places of amusement, usually accompanied by Mr. Verdugo and the appellant. On some occasions the children were taken out to eat; at other times food was brought to the studio.

According to defendant's testimony, Mrs. Erickson had expressed dissatisfaction with Mr. Erickson, stating that a separation was imminent, and had asked appellant to take care of Kay Frances day and night for a period of time. On July 17, 1950, appellant found that the girl had been left at the studio where Verdugo was teaching on that day. Thereafter Kay Frances lived with appellant at the studio until death occurred on October 12, 1950. The appellant had an apartment at 32 Orange Street in Long Beach, but preferred living at the studio because of the inconvenience of transportation and the existence of a telephone at the studio. Appellant stated that the mother only visited the daughter once and that there was no indication of affection between the two.

On the morning of October 12, 1950, in answer to a telephone call, the fire department ambulance went to appellant's studio at about 6:30-6:40 a. m. The ambulance attendant found the body of Kay Frances Erickson lying on a studio couch. Although apparently dead the body was removed to the ambulance and a resuscitator applied with negative results. Upon arrival at the Seaside Hospital the girl was pronounced dead. Later that morning the body was taken to the Los Angeles County morgue where an autopsy was performed by Dr. Victor Cefalu, Assistant Chief Autopsy Surgeon. The

body was covered with multiple cuts, burns, abrasions, and contusions.

The cause of death was given as "aspiration of food," defined by Dr. Cefalu to mean "the drawing down of food into the air passages due to multiple injuries." Under circumstances similar to those found in the instant case, such aspiration of food might result from two causes, namely a state of unconsciousness resulting from injuries, or from some obstruction to normal ejaculation of vomit such as a gag tied around the mouth.

In the opinion of the examiner, none of the wounds were self-inflicted; some were so located as to make self-infliction unlikely. Some of the wounds were apparently of recent origin; others were superimposed upon older wounds. There were numerous slicing wounds from some sharp instrument such as a razor blade, some apparently inflicted only a short time prior to the girl's death. Certain burning wounds had been produced only a few minutes or a few hours before death.

A triangular area of abrasion appeared in the pubic region; a vaginal tear was present, and both vagina and anus were found to be dilated and open. It was the examiner's opinion that these conditions indicated a frequent stretching of the parts over some period of time, and the introduction of some object "of considerable resistance."

The girl's head had been subjected to a series of injuries which could well have been caused by blows; some of such injuries were of recent origin, while others may have been received a few weeks before death. Marks and indentations upon wrists and ankle were compatible with a condition caused by tying straps tightly around those areas. Likewise, a state of lividity found in feet and legs was consistent with the theory that the child died while strapped in a chair.

The body appeared somewhat emaciated, which condition could have been the result of a continued or intermittent series of torturing injuries, and of insufficient feeding. It was the examiner's opinion that the wounds found would have been sufficient to cause unconsciousness, and taken in the aggregate would have ultimately resulted in the girl's death. Although it was not possible to fix the exact hour, Kay Frances' death was estimated to have occurred at about 1 a. m. on October 12, 1950.

The appellant contended that the injuries must have been self-inflicted; that Kay Frances had a habit of inflicting similar injuries and of masturbation; that Miss Berling had

never "laid a hand on the child in any way," and had not fastened the girl to a chair. Appellant's account is that Kay Frances appeared to be all right at the time of retiring on the evening before the death, and at that time was not strapped in a chair. Miss Berling claims to have fallen asleep in a chair after writing some music; that about 6 a. m. noise from the adjoining room wakened appellant where the little girl was discovered strapped to a chair, but conscious and able to speak. There was a white shirt wrapped around the girl's head in bandana fashion with the arms of the shirt tied about the neck. Another shirt was on backward with a couple of buttons fastened in the back.

When found by appellant, Kay's head was hanging down as though asleep, and "her eyes appeared as though she were in a trance." After removing the straps, appellant claims to have placed the girl on the couch, and telephoned Mr. Verdugo that Kay Frances was either in a trance or dying. Mr. Verdugo arrived shortly thereafter; appellant telephoned Dr. Hanson, and pending arrival of the ambulance, attempted to administer artificial respiration. It was appellant's opinion that the girl was alive when wheeled out of the studio on a stretcher, and that the aspiration of food may have occurred when the ambulance attendants attempted artificial respiration.

As hereinbefore indicated, there were no eyewitnesses to the crime and no direct evidence of appellant's guilt. The record discloses, however, various circumstances leading to a legitimate inference of guilt, and a tenable hypothesis in support of the conviction. In this connection it may be noted that appellant was alone with Kay Frances in the locked studio all of the night preceding the girl's death; Miss Berling's contention that the wounds were self-inflicted is refuted by medical testimony as before mentioned; it is improbable that the victim could have strapped herself in the chair. Certain witnesses testified to having previously seen Miss Berling strap the girl to chairs and a filing cabinet, and commit other acts towards the child, such circumstances leading to an inference of guilt rather than innocence. It cannot be said, as appellant's brief avers, that "the inference of guilt drawn from the evidence was wholly unwarranted."

Contradicting appellant's protestations of affection for Kay Frances and denials of the use of force or violence, is the testimony of Lora Carpenter, aged 9 years, who had taken accordion lessons from appellant for two and one-half

years. The witness testified that two or three days before the death, appellant had tied Kay Frances in a standing position to a filing cabinet, the girl being left thus tied while Mr. Verdugo took witness and appellant out to dinner, a period of about one and one-half hours. Kay had been tied to the filing cabinet at least two or three times; the witness had also seen appellant strap Kay in a chair several times, and on one occasion defendant had left Kay on the floor for several hours with hands tied.

Lora had seen a bandage tied all over Kay's face except the eyes and nose at least three or four times; on one occasion when the children had been taken to a movie, Kay Frances' eyes were covered with several scarves which were left on during the entire picture. On other occasions appellant had kicked Kay Frances for not getting the accordion right and had told the other children to kick Kay. Appellant had also been seen to hit Kay's hands with a ruler many times, and to slap Kay quite hard across the face.

On one occasion when Lora, Jimmie and JoAnn, all accordion pupils, were at the studio, appellant directed Kay Frances to "pull her pants down," stand about two feet in front of the children, and "play with herself," and was told to "keep showing us what she was doing" until appellant told Kay to stop. Violet had Kay continue the performance until the other children looked away. The appellant "told us kids if we told our parents that something dreadful would happen to us." At that time Lora saw bruises and cuts on Kay Frances' legs up to the knees.

The witness had seen other cuts and bruises on Kay's head and body, and had seen appellant tie bandages around Kay's head. "Whenever she would punish Kay, before she would do so, she would say something dreadful would happen to us if we told." Sometimes cuts on the girl's legs would be bleeding and blood would be dripping on the floor. To cover up black and blue marks on Kay's head and face, appellant put on "cream cake makeup." The witness had also seen Mr. Verdugo spank Kay Frances with a strap. Lora had seen appellant hit JoAnn, another pupil, on the face, while the children were practicing.

Somewhat similar, if less detailed, is the testimony of another pupil, Mary Jo Furey, aged 14, who had seen appellant slap Kay Frances' face, and to say "I am not scared to beat you in front of her," meaning Mary Jo. Kay was

required to stare at Mary Jo and was kicked in the shin quite hard to enforce the order.

Thelma Watts, who took lessons from Mr. Verdugo, saw Kay Frances in September, 1950, with blackened eyes, described as purplish, puffy, and barely open. Appellant's explanation was that "the little girl believed she could heal herself and that was the reason she had done—blacked her eyes, made her eyes in the condition they were." One of Kay's fingers was bandaged and two or three other fingers were black and blue. Miss Berling had stated that Kay had "bumped her head against the wall and on the accordion in self abuse," and in respect to the finger injuries, "she said she had chewed them."

Waitresses at the Panama Café testified that appellant and Verdugo often brought Kay Frances there; that the little girl was quiet and did not look happy; that bruises on face and legs were explained as having been self-inflicted. One waitress could not recall any occasion when a meal was ordered for Kay although sometimes the child would get a cracker or a little soup from one of the others. On one occasion, in answer to the waitress' inquiry as to the condition of Kay's eyes, the appellant said, "she is not telling anything about how she got her eyes, she isn't talking."

Although, as appellants points out, there was evidence of gifts being made to Kay Frances and other pupils, etc., the general purport of the testimony is that the child had at times been mistreated by appellant, who had instilled fear in the children's minds with threats that "something dreadful would happen to us" if parents were told what was going on at the studio.

What may be denominated as appellant's main contention is that "A major part of the trial was conducted in the absence of appellant," who, although physically present in the courtroom, was often unconscious or only semiconscious, and "mentally absent during much of the trial." Appellant's affidavit seeking a new trial recites that "her trial began January 3, 1951 . . . ; she recalls the selection of the jury, the opening statement by Mr. Ted Sten, co-counsel for the People, and many of the witnesses who testified against her . . ."

Miss Berling "recalled wire-playing apparatus set up on or about March 8, 1951; that thereafter she became unconscious and recalls only occasional happenings in the court room . . . until April 28, 1951, when she heard a woman

scream, and thereafter heard the judge read something to the effect that the defendant was guilty of murder in the first degree, and heard him ask the jury if that was their verdict, at which time she again lapsed into unconsciousness . . . that she has no recollection of conferences with her attorney between March 8 and April 13; that she had desired to have Miguel Verdugo called as a witness on her behalf and was not aware of the fact that he had not been called; that she was unaware of the fact that she had fainted 11 times in the court room, twice on the witness stand,'' etc.

That during the latter part of the trial Miss Berling was unwell is full borne out by the record. According to appellant's count, there are 47 separate references to appellant's mental and physical condition between March 8 and April 12, 1951, including many (appellant's brief says 20) recesses granted for this reason, extending from a few minutes to five days. For example, on March 8, the trial court excused the jury, having observed that appellant appeared ill with ''a severe tremor and she is sitting now at the counsel table with her head down and her eyes closed part of the time.'' To the court's inquiry ''She gave me no answer, which doesn't show an alertness that is necessary for a defendant in her position.''

Although appellant ''stated she could carry on,'' and did not wish to have a doctor called, the court did not ''agree with her''; a recess was taken until the afternoon session. and a physician was called. According to the doctor, appellant ''appeared listless and apathetic,'' although then conscious. The patient complained of headaches, weakness and dizziness.

It was the physician's opinion that ''her present condition is functional, that it is an emotional and nervous upset from strain. . . . Well, I believe she is capable of understanding a wire recording or understanding questions and answers. I think that with an emotional disturbance such as she has, some inattention to her surroundings is apt to result.'' The witness further stated that whether the trial might proceed without detriment to appellant's interests, ''is largely up to her.''

Upon appellant's statement that the trial might go on, ''but I might become dizzy,'' the court said: ''We can't tell when you are going to become dizzy or when you are in such a condition that you don't know what is going on. Will you try, if you feel something like that coming on, to let Mr.

Ramsey or the Court know of that condition so that we can stop any proceedings until you are not dizzy and are fully conscious?" to which appellant responded, "Yes." Miss Berling stated that "Sometimes the room keeps going round."

On March 14, appellant was unnerved and shaking; the judge again stated, "If you feel faint, or if you are not conscious of what is going on, Miss Berling, tell me or your counsel." However, as noted in appellant's brief, the court did not indicate "How appellant would inform the Court of her unconscious state, if she were unconscious!" Later that same day, while on the witness stand, the accused asked for and was given a recess.

Again, on March 15, the court's attention was called to the fact that Miss Berling appeared tired. Later that day the court got no response to an inquiry as to appellant's condition; finally appellant admitted being upset, dizzy, and not able to think clearly. Then, although the court stated "She is ill and we will have to go over until tomorrow morning because of her illness," nevertheless the proceedings continued with stipulations and corrections of testimony in the daily record and in the preliminary transcript. Certain testimony was stricken from the record and the jury admonished to disregard it. A recess was then taken because of appellant's condition.

On March 20th, appellant's answers to questions became inaudible, and the condition of dizziness having returned, the trial was recessed until the following day. On March 28th, during cross-examination, appellant, as Judge Miller stated, had "the appearance of being very tired and of not being in a position to look after your interests very well . . . Now you are closing your eyes. You are practically dropped over as though you were in a poor physical and mental state." However, appellant indicated the trial could proceed; later the district attorney called attention to appellant's tired and worn appearance; a short recess was taken, and appellant again claimed to be able to proceed. A few minutes later appellant asked for a recess and fainted.

The following morning appellant thought the trial might safely proceed. The court, however, observed that "She has the appearance of being not clear in her mental behavior. She is just not alert, to me, plus the other things we have in the record. I don't think she is in condition to go ahead this morning" and mentioned that the day before appellant had "seemed to lose partial consciousness at least." The jail

physician, Dr. Crahan, reported that appellant was not physically or mentally ill but was suffering emotionally due to strain; that "she was subject to fainting spells." Appellant complained of feeling dizzy, but felt able to go ahead; the district attorney resumed cross-examination whereupon appellant fainted and fell from the witness stand.

Court was adjourned until the following Monday, April 2d, at which time a woman deputy sheriff was requested to sit beside appellant. Later a recess became necessary because of the appellant's faintness. On April 3d although dizzy and "woozy," Miss Berling resumed the witness stand but about 11 a.m. fainted again and fell out of the witness box. Appellant's condition appeared to be worsening rather than improving, causing the judge to remark: "I can't have the jury sitting here watching a defendant fall to the floor day after day in a fainting condition and in a condition that shows she gives every impression she is not able to look after her interests." In the afternoon the defendant was still weak and dizzy and a recess taken until the next day, appellant being then returned to the hospital section of the jail.

On April 4th, appellant was "somewhat dizzy, your Honor, but I can go on the stand." Mrs. Baust, deputy sheriff, reported that appellant's condition was "Very poor, . . . worse than yesterday morning. On the way in she seemed to be on the verge of consciousness and that is all. . . . I let her sleep on the way down. When she got out she would stagger and I would catch her. She pitches forward and then regains consciousness the minute I catch her. It is touch and go." Counsel for both sides agreed that the trial could not go on and adjournment was taken until April 9th.

On the adjourned date, cross-examination of appellant was resumed but some of the questions had to be repeated three times. Appellant again became weak and faint whereupon court was recessed until the next day. Cross-examination was again resumed although appellant was somewhat dizzy; in the middle of a statement by the district attorney appellant started to faint and a recess was declared. The next day appellant resumed the stand but swayed back and forth, was having tremors, and finally started to faint but "said she wanted to keep on going."

The record discloses that similar episodes occurred on ensuing days, and on April 12th, appellant again fainted. After a brief recess, the trial court stated: "I have been informed by the Deputy Sheriff, Mrs. Baust, that the defendant did

not lose consciousness during this last partial fainting and loss of strength to go ahead, but that she was in a state of collapse.'' Notwithstanding the above condition appellant still expressed a desire to proceed with the trial, and re-examination was continued. However, because of Miss Berling's condition, the reexamination was concluded by the making of stipulations as to matters to which the witness would have testified.

Frequent remarks by the trial judge to the effect that ''the defendant gives evidence of not being in a condition to proceed,'' cannot but indicate that the court entertained serious doubts as to whether appellant was conscious, semiconscious, or unconscious during various phases of the trial. It is well to note that in the present case there appears to be no charge that Miss Berling was malingering. Indeed, appellant's condition was readily observable, not only calling forth comment from the trial judge but also from the deputy district attorney who openly questioned the advisability of continuing with cross-examination. That the situation was of an especially serious nature seems to have been recognized by everyone connected with the case.

Article I, section 13, of the California Constitution gives a defendant the right to appear and defend in person, and section 1043 of the Penal Code provides that ''If the prosecution be for a felony, the defendant *must* be present at the trial.'' (Italics added.) The rule is familiar and fundamental, ''that the prisoner, in case of a felony, must be present during the *whole* of his trial.'' (Italics added), quoting from *People* v. *Kohler*, 5 Cal. 72. The same case states: ''In favor of life, the strictest rule which has any sound reason to sustain it, will not be relaxed.''

The only reasonable interpretation of the above requirement that a defendant be present at every stage of a felony prosecution is that the accused person must be both physically and mentally present. Mere physical presence without mental realization of what was going on would obviously be of no value to the accused. A defendant in such condition would be unable to confer with or assist counsel, unable to testify, and without ability to understand the nature of the accusation or the mechanics or consequences of the trial. An interpretation of the rule as requiring only physical presence would lead to such an absurdity as the purported trial of an imbecile or an insane person without the least understanding of what was taking place in the courtroom. Only

in the most unenlightened age could such a so-called trial be countenanced.

Founded as it is on reason and natural justice, it is hardly necessary to cite authority for the principle just mentioned. The question has apparently not received the direct attention of courts of this state, and rarely elsewhere, perhaps because of its obvious nature. ■ However, in an English case, *Rex* v. *Lee Kun* (1916), 1 K.B. 337, 9 British Ruling Cases 1121— C.C.A. cited in 14 American Jurisprudence 899, it is held that "The presence of the accused means that he must be not merely physically in attendance, but also capable of understanding the nature of the proceedings."

■ Appellant has cited *Reid* v. *State*, 138 Tex. Crim. 34, [133 S.W.2d 979], where although a defendant had suffered an epileptic fit and a physician had stated it would be an hour or more before defendant would be conscious, the trial court denied continuance and ordered the trial to proceed through the jury challenges. In that case the reviewing court said: "If a defendant in a felony case should be bodily present in the court room but in an unconscious condition, it cannot avail him his right to be present in the fullest sense, for it certainly cannot be said that he has the opportunity . . . to assist his counsel in the conduct of his case. It would be a mere sham to say that he was confronted with his accusers if he were not able mentally to realize their presence."

That the principle just mentioned would in a proper case find adoption by the California courts is indicated by the following quotation from *People* v. *Singh*, 78 Cal.App. 476, 481 [248 P. 981] : "Appellant further complains of the refusal of the court to grant a motion for continuance made during the trial on the ground that defendant was ill and could not be consulted by his counsel. The record on appeal, however, satisfactorily shows that on such suggestion being made by counsel for defendant, an adjournment of court was had until the following day, at which time, so far as appearances as disclosed by the transcript are concerned, defendant had recovered from his indisposition and was able to advise with his counsel."

■ If, in the instant case, it could be safely said that the trial only proceeded during such times as Miss Berling was fully conscious of what was going on, all would be well. Unfortunately, the record seems to disclose that such was not the case. The trial court repeatedly remarked that the defendant gave the impression of not being "able to look after

her interests," and not "being able to proceed." Many statements made during the trial clearly indicate that it was impossible to know whether the defendant was entirely conscious or able to proceed with the trial despite Miss Berling's willingness to go on. "When your voice drops as it does and your eyes partially close and open slowly, the appearance is that you are not in a condition to observe what is going on." There was "a serious question" in the trial court's mind as to how cross-examination could be conducted "under these circumstances."

Notwithstanding these legitimate doubts as to whether the defendant was mentally present at all stages of the proceeding, the trial continued and was finally submitted to the jury. The affidavit offered in support of the motion for a new trial averred that Miss Berling possessed only a fragmentary and hazy recollection of what took place during the latter part of the trial. Only when the trial was finished did appellant realize that a most important witness, Mr. Verdugo, had not been called to testify. The testimony of this witness who was intimately familiar with affairs at the studio, might easily have changed the entire aspect of the case by proving or disproving contentions put forward by the appellant and the district attorney.

That the trial court fully appreciated the seriousness of the situation is apparent from the many adjournments and statements hereinbefore mentioned. Although it is evident that the trial judge made a sincere effort to fathom the defendant's condition, it is also apparent that neither the judge, nor the physicians, nor the appellant, were able to solve the problem. Although it became increasingly apparent that Miss Berling was in no fit condition to be tried, the inquisition went on.

The real reason for continuing with the trial of the case is shown by the trial court's statement made at the argument of appellant's motion for a new trial: "it was our attempt to get this case ended so that we could have a conclusion of it one way or the other, and that's what we did." In other words, anxiety to finish the long and difficult trial was given priority over the more important question of the defendant's mental condition. The trial court's statement at the hearing of the motion for a new trial, that the trial was always stopped when the defendant was not in a proper condition to go on, is not reassuring in view of the record.

As appellant's brief points out, "that the court was unable to assess appellant's condition is illustrated by the fact that he not only allowed, but ordered, proceedings to continue to the point where, on numerous occasions, she collapsed into unconsciousness while on the witness stand, and several times fell from the witness box." The exact periods and extent of Miss Berling's unconsciousness and semiconsciousness are unknown. In dealing with such a defendant who had fainted some 11 times during the trial; who was so frequently "dizzy," "groggy," "woozy," inattentive to surroundings, "unable to think clearly," unable to advise with counsel, only semiconscious if conscious at all at various periods, the only safe procedure, obviously, was to entirely stop the trial. This was not done. Any idea that such an error was harmless cannot be entertained.

■ Respondent's assertion that "since the evidence warrants the verdict, and since there was no prejudice, the conviction should be affirmed," is untenable. The existence of substantial evidence in support of the verdict does not cure the fundamental error of forcing the accused to stand trial while not in the full enjoyment of consciousness and mental power. Whether guilty or innocent the same rule must be given application. Constitutional and statutory provisions in reference to the conduct of a felony prosecution were designed to secure to every accused person a fair trial, not merely to those who are innocent. Full and strict observance of such rules is the primary responsibility of every tribunal assaying to try such a case.

■ Nor will it do to dispose of the matter by saying that it was within the trial court's discretion to go ahead with the trial, as was done in the instant case. No court possesses any discretion whatsoever in reference to giving or withholding the fundamental rights and privileges of one accused of murder.

■ In reference to the other points relied on by appellant as justifying reversal, it need only be said that the record fails to show prejudicial error. One of these contentions relates to the admission of evidence concerning the defendant's background, personal and family history, and general activities not directly germane to the issues. Some of this evidence was of no particular importance one way or the other; some of the testimony was subsequently stricken and the jury admonished to disregard it.

 Likewise, the admission of an anonymous letter accusing Kay Frances' mother of partial responsibility for the murder, and using derogatory epithets in reference to the mother and appellant, to "show the possible state of mind" of the mother, was doubtless an error, but can hardly be deemed of prejudicial nature.

 The same may be said in reference to the reading to the jury of the district attorney's transcript of a wire recording of an interview with the appellant. The recording itself was played to the jury and the appellant had the opportunity to correct any erroneous rendering. Other items of evidence specified by appellant were likewise without material prejudice to the rights of the accused.

 Appellant's brief also complains of conduct and statements made by the deputy district attorney during trial of the case. Most of these incidents occurred in the heat of animated discussion, and appear to have had no prejudicial effect. The jury was duly cautioned that the arguments of counsel are not to be considered evidence.

 Complaint is made that "The Court erred in permitting Volumes 34 and 35 of the daily transcript to be taken to the jury room." These volumes concern testimony about wire recordings, and Deputy District Attorney Sten's version thereof, and include certain argument and discussion in chambers concerning admissibility of evidence. Section 1137 of the Penal Code prohibits a jury from taking "depositions" into the jury room. Appellant also cites section 1181 prohibiting reception of evidence out of court, in reference to off-the-record discussions in chambers. Respondent's brief notes that no objection to the above procedure was made by the defendant, and in any event, no prejudice can be said to have resulted.

 Another assignment of error relates to the giving and refusing of instructions relating to the effect of filing the information, defining proximate cause of death, presumption of innocence, etc. No prejudice to defendant's rights can have resulted where the instructions, taken as an entirety, constitute a correct statement of the law, as was the situation in the instant case.

 Misconduct of jurors is alleged in that "Juror No. 3 mingled with a hostile crowd" after the trial had recessed for the day; that the same juror had "answered a material voir dire question falsely" when "asked if she had studied psychology," the juror's answer being that "she had

not, except for the usual courses in college." In denying defendant's motion for a new trial, the judge stated that the only showing was that the juror had "stood down on the street or in the alleyway down here, or somewhere else close by," and had looked on while appellant was being taken from the building. The further statement of the trial judge, "I can't find that that conduct is anything at all that would entitle the defendant to a new trial," correctly sums up the matter.

 The final contention is that "The Court erred in admitting certain psychiatric testimony" to the effect that the expert, Dr. Dwankowski, had never known of a case of a sane child who had not reached puberty, "mutilating herself masochistically" in the areas and to the extent shown by post-mortem photographs, etc. Since it was the appellant's claim that the child's injuries were self-inflicted, and the jury was instructed, "You are not bound to accept the opinion of an expert as conclusive, but you should give it the weight to which you shall find it to be entitled. You may disregard any such opinion, if you find it to be unreasonable," no prejudicial error is apparent in respect to this matter.

As hereinbefore indicated, however, the conviction cannot be approved because of the violation of defendant's fundamental right to be physically and mentally present and fully conscious during all stages of the trial.

The judgment and order denying motion for new trial, are reversed, and the cause remanded for a new trial.

White, P. J., concurred.

DRAPEAU, J., concurring.—I have checked the record against the able statement of the facts by my associate, Mr. Justice Doran. I agree with him that it must be concluded that the defendant on numerous occasions did not, and could not have known what was going on at her trial. It is a fair assumption that for a part at least of her trial defendant's mental and physical condition precluded that participation in the defense of every person charged with crime which our law requires and guarantees. I concur.

A petition for a rehearing was denied January 21, 1953, and respondent's petition for a hearing by the Supreme Court was denied February 5, 1953. Edmonds, J., Traynor, J., and Spence, J., were of the opinion that the petition should be granted.