[Crim. No. 6789.   Second Dist., Div. Two.   Mar. 16, 1960.]

THE PEOPLE, Respondent, v. JOSEPH GUILLORY, Appellant.

Arthur Schwartz for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Robert M. Sweet, Deputy Attorney General, for Respondent.

ASHBURN, J.—Appeal from conviction of bribery.[1] Appellant was arrested for a narcotics violation; this occurred while he was in possession of heroin, surrounded by familiar facilities for its use and in the company of two accomplices. He asked one of the arresting officers, Sergeant Harry E. Dorrell, to go into the bathroom and talk to him alone. Search of his person had revealed that defendant had a roll of fifteen $100 bills in one pocket and $62 in another. When the two were alone defendant said: "I've got $1500. Why don't you just take the 15 bills and let me go." He repeated this two or three times and Dorrell said: "Just a minute." He thereupon brought Sergeant Guindon into the room and defendant repeated the offer in his presence. Both officers declined to accept the money or to release defendant. As he and his two accomplices were being taken to the police car a large Negro woman came out of the house and said to Dorrell: "Joe wants to give you $3000" (or perhaps it was $3,500 according to Dorrell) "if you will let him go." The officer told her "no."

[1]Pen. Code, § 67: "Every person who gives or offers any bribe to any executive officer in this State, with intent to influence him in respect to any act, decision, vote, opinion, or other proceeding as such officer, is punishable by imprisonment in the state prison not less than one nor more than 14 years, and is disqualified from holding any office in this State."

She lifted her voice and said to defendant, who was about five to seven feet from her: "No, they won't take it." Sergeant Guindon heard the woman's remarks and phrased the matter thus: "When we approached the car in this group, this Betty said—I can't recall the amount but that Joe wants us to take the money or a certain sum and let him go. Both of us said no. At this time she turned around and she yelled or shouted in a loud voice 'Joe, Joe, God damn it, they won't take it. I told you they won't.'" At the police station defendant twice said to Dorrell: "Why don't you take the $1500 and just let me go" and on one occasion said: "Just leave me enough money to get back to Frisco." The answer was "No, I cannot do it."

Defendant was charged with the narcotic violation but the information was dismissed at the preliminary hearing when Officer Dorrell declined to reveal the name of an informant whose statements led to the search and the discovery of the narcotic violation. Later the bribery charge was filed and a nonjury trial resulted in the conviction from which the present appeal is taken.

Counsel does not question the sufficiency of the evidence but relies upon three points, (1) that the court erred in permitting use of evidence obtained through an unlawful search and seizure, (2) the court erred in receiving hearsay evidence over defendant's objection, namely, the remarks of the large colored woman above quoted, (3) defendant was denied due process because the trial was conducted at a time when he was unable to hear the testimony. None of these contentions is meritorious.

▮▮▮ The heroin and instrumentalities taken at the time of arrest were never offered or received in evidence at the bribery trial, nor was any effort made to ascertain the identity of the informer. If the entrance into the house where defendant was arrested was not justified (the officers had no arrest or search warrant), or if the narcotic arrest was perchance unlawful, the tort or combination of torts had spent their force and had nothing to do with the crime of bribery except as they furnished the setting for it. The attempt to bribe the officers arose after the search and seizure were over and after the arrest was made. It came spontaneously from defendant, not only at the house where he was arrested but also at the police station. Only the intervening unregenerate heart of defendant could have produced it. The philosophy of the following cases is applicable: *People* v. *Boyles,* 45 Cal.2d 652, 654 [290 P.2d

535] ; *People* v. *Martin,* 45 Cal.2d 755, 763 [290 P.2d 855] ; *People* v. *Maddox,* 46 Cal.2d 301, 305 [294 P.2d 6] ; *People* v. *McCarty,* 164 Cal.App.2d 322, 329 [330 P.2d 484]. ▮ The effect of the earlier authorities is thus summarized in the McCarty case, *supra,* at page 329 : "Unlawful activity which does not produce the evidence sought to be suppressed and which is entirely unrelated and collateral to the securing of such evidence affords no basis for applying a rule of exclusion."

▮ Moreover, the validity of the narcotic arrest or the search and seizure attendant upon it is of no consequence in this bribery case, for the officer was acting within his general authority and believed himself entitled to make the search, the arrest, and to hold the prisoner. In *People* v. *Lips,* 59 Cal. App. 381, a prosecution for agreeing to accept a bribe, the court said, at page 388 [211 P. 22] : "It is contended by the attorney-general that under this enactment it was not necessary, in order to render appellant guilty of the charge made against him, that at the time his agreement with the Furays was consummated he should have been clothed with a then present authority to take the husband into custody." The court quoted from 4 Ruling Case Law, page 183, par. 13 : " 'The giving or receiving of money . . . for the purpose of influencing official conduct is not deprived of its criminal character by the fact that the action contemplated is not within the officer's jurisdiction. If he acts in his official capacity—and by this term is meant the doing of such acts as properly belong to the office and are intended by the officer to be official—the offense is complete.' " (P. 389.) From a Texas case it also quoted : " 'It is insisted by counsel for defendant that the arrest and custody of John Gable by the defendant was without authority of law, and that, therefore, it was no offense for the defendant to accept a bribe to release him. We do not so understand the law. It was by virtue of his official authority that the defendant arrested and held John Gable. It matters not whether the arrest and custody were legal or illegal ; the said Gable was a prisoner in the custody of the defendant, a peace officer, and was permitted by the defendant to escape, in consideration of money paid him to effect such escape. We are of the opinion that, in a prosecution for this offense, it is not permissible for the defendant to question the legality of his custody of the prisoner. Such an issue is irrelevant and immaterial. The moral obliquity of this offense is the same where the custody of the prisoner is illegal

as where it is legal, and the injury to public justice is the same.'" (P. 390.) To the same effect are 9 Cal.Jur.2d, § 9, p. 58; *People* v. *Anderson*, 62 Cal.App. 222, 224-225 [216 P. 401]; *People* v. *Anderson*, 75 Cal.App. 365, 372-373 [242 P. 906]; *People* v. *Longo*, 119 Cal.App.2d 416, 420 [259 P.2d 53]. Longo was a case of offering a bribe, but of course the fundamental principle is the same as in the Lips situation.

It is stated at page 420 of the Longo case, *supra*, as follows: "Second, it is not essential to the crime of bribery that the officer's action is with actual authority so long as it falls within the general scope of his duties and he is purporting to act in his official capacity."

The contention that the statements of the woman (called Betty by one of the officers and Peggy by defendant) were hearsay and improperly admitted over objection cannot be sustained. Officer Dorrell testified that she talked with defendant first and then made the proposition on his behalf to the officers; that she raised her voice when telling defendant, five to seven feet away, that they rejected it. Officer Guindon said that she yelled or shouted to defendant in a loud voice. Having talked to defendant immediately before submitting the bribe offer to the police, a fair inference arose that he authorized her so to do; especially is this true when considered in the light of her immediate relaying to defendant of the refusal of the bribe and his own failure to make any response. But, says counsel, he is deaf and did not hear what she said. It is true that the record discloses some degree of deafness on his part and that he was wearing black horn-rimmed glasses "which he told us had a hearing aid in the part over his ears," according to Officer Dorrell. It was a question of fact for the trial judge whether the circumstances warranted the inference that defendant heard Peggy's offer and the officer's refusal and her report of same. The record would not justify our attempting to review his decision of that question. But if this evidence were strictly hearsay and its reception erroneous, that fact could not effect a reversal for guilt was adequately established by other competent evidence.

Lastly, it is contended that defendant was denied due process because he could not hear the proceedings at the trial. The record does not support the claim factually or legally. The trial was completed in one day. Defendant had been on bail since December, 1958, and the trial was held on June 8, 1959. As soon as the first witness began to testify defendant's counsel raised the matter of deafness. "MR. BUSBY:

Just a moment, please. Your Honor, the defendant cannot hear what is being said. THE COURT: Now how are we going to correct this, Mr. Busby? MR. BUSBY: Just a moment. I will try to correct it. Do you have any batteries or anything with you? THE DEFENDANT: I ran out. MR. BUSBY: Your Honor, could I have the defendant stand next to the witness? Possibly he can hear him that way. THE COURT: Yes, let him get over there. He is on bail, is he? MR. BUSBY: Yes. THE COURT: Let him go over there. Keep your voice up, Mr. Guindon, so he can hear you. Let him sit in the jury box. You can sit with him there, Mr. Busby. MR. BUSBY: That is all right, your Honor.'' Obviously satisfied with the arrangement, defense counsel made no objection to proceeding with the trial. At the opening of the afternoon session the following remarks were made: ''THE COURT: All right, do you want to put the defendant back here. He has his hearing aid with him now. MR. BUSBY: He has no hearing aid with him at this time, your Honor.'' But defendant, when he took the stand, said: ''I have a battery now,'' though ''I didn't have any batteries when I was in Court this morning. . . . THE COURT: You can hear what is going on? THE DEFENDANT: Some things. THE COURT: All right. THE DEFENDANT: Some things I can't. THE COURT: You did hear the oath, though? THE DEFENDANT: I heard it.'' No objection was made to proceeding further or effort made to change the seating arrangements in any manner. Nor did defendant appear to have any difficulty in following the proceedings. Not until the time came for sentencing was the subject of hearing raised again. ''MR. BUSBY: Your Honor, the defendant is hard of hearing. THE COURT: Is Joseph Guillory your true name? Can you hear me? THE DEFENDANT: I don't have my hearing aid. Yes.''

It is quite apparent that any difficulty defendant may have had in following the proceedings was self-induced. His reliance upon *People* v. *Berling,* 115 Cal.App.2d 255 [251 P.2d 1017], is therefore misplaced. That opinion says, at page 267: ''The only reasonable interpretation of the above requirement that a defendant be present at every stage of a felony prosecution is that the accused person must be both physically and mentally present. Mere physical presence without mental realization of what was going on would obviously be of no value to the accused. A defendant in such condition would be unable to confer with or assist counsel, unable to testify, and without ability to understand the nature of the accusa-

tion or the mechanics or consequences of the trial. An interpretation of the rule as requiring only physical presence would lead to such an absurdity as the purported trial of an imbecile or an insane person without the least understanding of what was taking place in the courtroom. Only in the most unenlightened age could such a so-called trial be countenanced." The facts of that case are summarized in *People* v. *Rogers,* 150 Cal.App.2d 403, 411 [309 P.2d 949], as follows: "That was a murder case and it appeared that the defendant was at times during her trial 'woozy,' 'dizzy,' 'not clear in her mental behavior,' 'not alert,' 'listless and apathetic,' and suffered numerous fainting spells. In her affidavit for a new trial she averred that she was unconscious during most of the proceedings, recalled only occasional happenings in the courtroom, and had no recollection of certain conferences with her attorney. The appellate court noted 47 separate record references to her mental and physical condition, including many recesses granted for that reason, extending from a few minutes to five days. A physician testified that the condition was functional, being an emotional and nervous upset from strain. The trial judge made various remarks indicating that, in his opinion, the defendant was suffering from these conditions in good faith, and once 'the district attorney called attention to . . . [defendant's] tired and worn appearance . . .' (P. 265.) The recesses were taken at the suggestion of the judge on most occasions; the defendant usually indicated her willingness to continue despite her condition. A woman deputy reported that defendant's condition was 'very poor,' that she seemed on 'the verge of consciousness and that is all,' and that 'it is touch and go.' "

Rogers claimed a diabetic coma resulting in a blackout on the last morning of his trial. Concerning self-induced mental or like absences the court said, in part: "This case differs fundamentally from the Berling case in that there was no evidence in that case that the mental condition there involved was self-inflicted, and there was no evidence of malingering on the part of the defendant. In the instant case there is substantial evidence that defendant's condition was largely the result of his voluntary actions." (P. 412.) "It is a reasonable inference from the record that the state of affairs existing on that afternoon was intentionally brought on by defendant for the purpose of forcing a continuance. Thus, the issue is a more limited one than was involved in the Berling case. It is whether this voluntary 'mental absence' of the

defendant at the conclusion of his trial was a violation of defendant's constitutional and statutory rights to be 'present' when his case was tried. This, in turn, depends upon whether a defendant in a felony case can waive his right to be mentally present at his trial by voluntarily absenting his mental self after the trial has commenced." (P. 413.) "The defendant, by his own actions, induced the condition existing in the afternoon of the fourth day of the trial. This amounted to a waiver of the right to be mentally present granted by section 1043 of the Penal Code. If this were not the rule, many persons, by their own acts, could effectively prevent themselves from ever being tried. A diabetic can put himself in insulin shock by simply taking insulin and then not eating, or by refusing to eat, or can disable himself by failing to take insulin. Surely, the Legislature in adopting section 1043 did not intend such an absurd result." (P. 415.)

It is a generally accepted rule that a trial judge should afford to a defendant who is handicapped by deafness, blindness or other affliction, such reasonable facilities for confronting and cross-examining the witnesses as the circumstances will permit. But he cannot restore sight to the blind, hearing to the deaf or speech to the mute. He need only give such aid to intelligent appreciation of the proceeding as a sound discretion may suggest. "If the accused is deaf or blind, so that on being confronted by the witnesses his physical infirmity will lessen his capacity to utilize his right, this will not prevent his being subject to trial. In the proper administration of justice, however, the court should give a person accused of crime a reasonable opportunity to obtain the benefit of this constitutional right. If he is deaf, such opportunity as may be necessary should be allowed for communication to him of the testimony of the witnesses to insure him a full and fair exercise of his legal rights. The exact manner in which this result should be arrived at must depend on the circumstances of the case and, to a considerable extent, be left to the sound discretion of the court." (14 Am.Jur., § 181, p. 892.)

*Ralph* v. *State,* 124 Ga. 81 [52 S.E. 298, 2 L.R.A. N.S. 509] : "If the accused be deaf or blind, this will not prevent his being subject to trial because upon being confronted by the witnesses his physical infirmity will lessen his capacity to utilize that right. The accused says that he is deaf but can read. Had he been both deaf and illiterate, certainly he could not claim that he could not be lawfully tried for a criminal offense. In the proper administration of justice, however, the

court shall give a person accused of crime a reasonable opportunity to obtain the benefit of this constitutional right. If he is deaf, such opportunity should be allowed for communication to him of the testimony of the witnesses by the sign language employed by deaf mutes, or by writing, or in some other manner which would be reasonable and proper, under the circumstances, to insure him a full and fair exercise of his legal rights. The exact manner in which this result should be arrived at must depend upon the circumstances of the case, and to a considerable extent be left to the sound discretion of the court.'' (P. 299 [52 S.E.].) ''The defendant, knowing of his infirmity, should make provision for his own assistance, and not require the court to practically destroy an orderly trial.'' (P. 300 [52 S.E.].) To the same general effect are: *Wojculewicz* v. *Cummings,* 145 Conn. 11 [138 A.2d 512, 517-518] ; *Terry* v. *State,* 21 Ala.App. 100 [105 So. 386, 387-388] ; *Almon* v. *State,* 21 Ala.App. 466 [109 So. 371, 372] ; *Markiewicz* v. *State,* 109 Neb. 514 [191 N.W. 648, 650].

▮ The trial judge showed the appellant every reasonable consideration. No objection to the adopted procedure was made in the trial court. When equipped with his hearing aid appellant seems to have had no difficulty in following what was said. When he came to court without live batteries in the hearing device any handicap he may have suffered was self-imposed, and hence gave no ground for complaint. The record leaves no doubt that defendant had a fair and considerate trial and that he is guilty beyond a peradventure.

Defendant appeals from the ''judgment and sentence'' but they are one and the same thing. (*People* v. *Pierre,* 176 Cal. App.2d 198, 203 [1 Cal.Rptr. 223].)

Judgment affirmed.

Fox, P. J., and Herndon, J. concurred.