481 So.2d 1201 (1985)
Ernesto SUAREZ, Appellant,
v.
STATE of Florida, Appellee.
No. 65260.
Supreme Court of Florida.
December 19, 1985.
Rehearing Denied February 21, 1986.
*1202 James Marion Moorman, Public Defender and Douglas S. Connor, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Jim Smith, Atty. Gen. and Davis G. Anderson, Jr., Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
This case is a direct appeal from a trial resulting in a sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The state's evidence at trial showed that Suarez drove a car with four accomplices to a convenience store in Immokalee. Suarez waited in the car while the four accomplices went into the store and robbed the clerk at gunpoint. During the robbery an off-duty detective pulled into the parking lot of the store and observed the robbery in progress. He left the parking lot and called in marked units to aid in capturing the perpetrators. The accomplices got into the car and Suarez drove away from the store followed by the off-duty officer. When a marked sheriff's deputy's car pulled in behind Suarez, Suarez attempted to evade by speeding up. A high-speed chase ensued during which Suarez forced several oncoming cars off the road and also went through two attempted roadblocks. The chase ended when Suarez pulled into a driveway at a migrant labor camp, his car coming to rest at the rear of a parked bus. Four deputies by this time were close behind the getaway car, and they pulled into the area and stopped. Suarez got out of the car taking with him his .22 caliber semi-automatic rifle. He fired more than a dozen rounds from the rifle before it apparently jammed. One of those bullets found its way into the chest of one of the deputies as he was exiting his vehicle. The shot killed him instantly, a fact not discovered until a short while later after two suspects *1203 had been captured and Suarez and two other accomplices had fled the scene.
Suarez testified he didn't know of the robbery until he was driving away from the convenience store. He claimed he fired the rifle only after he saw the flash of muzzle fire from the direction of the sheriff's deputies, and that he had merely fired the rifle blindly. He claimed that this was an automatic reaction resulting from his military experience as a Cuban soldier.
The jury convicted Suarez of first-degree murder and armed robbery. In the penalty phase, Suarez's psychiatrist testified that the defendant had suffered a series of struggles since a child. He was expelled from his home for striking his stepfather and joined the Cuban military. He went AWOL and served time in prison before he was released to serve as a soldier in Angola. There he was wounded three times, once almost fatally. He emigrated to Miami during the Mariel boatlift where he became involved in the paramilitary group, Alpha 66. The psychiatrist testified that, although Suarez was not mentally ill at the time of the killing, when under great stress, "instincts for survival take over."
The jury recommended death, 8-4. In his sentencing order, the judge found no mitigating circumstances and three aggravating: The murder was committed during flight from a robbery, to avoid arrest, and created great risk to many persons.

SIMULTANEOUS TRANSLATION
Suarez first raises a claim regarding the use of an interpreter during his trial. Prior to trial the court appointed an interpreter to assist Suarez's counsel. Suarez spoke little or no English, and the state does not claim that an interpreter was not needed. The interpreter sat at the defense table throughout the trial. As the state pointed out at oral argument, the record does not show that the interpreter did not provide simultaneous translation of all English-speaking witnesses at trial (and the record would normally not show this, unless defense counsel or someone else specifically entered this observation into the record). Because we hold that failure to provide simultaneous translation under the circumstances here is not error, we do not need to resolve this record deficiency.
Prior to the sentencing, Suarez's defense counsel moved for retrial, claiming that Suarez had been denied a fundamental constitutional right by failure to have the entire trial translated to him. The judge denied the motion on the ground that the court had fulfilled its responsibility in appointing the interpreter, and that it was the defense counsel's responsibility to determine how that interpreter should be used.
We do not take issue with Suarez's claim that a non-English-speaking defendant has a right to an interpreter at trial. This right is grounded on due process and confrontation considerations of the Constitution.
Considerations of fairness, the integrity of the fact-finding process, and the potency of our adversary system of justice forbid that the state should prosecute a defendant who is not present at his own trial, unless by his conduct he waives that right. And it is equally imperative that every criminal defendant  if the right to be present is to have meaning  possess "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." Otherwise, "[t]he adjudication loses its character as a reasoned interaction * * * and becomes an invective against an insensible object."
United States ex rel. Negron v. New York, 434 F.2d 386, 389 (2d Cir.1970).[1] In other words, a defendant who has no way of *1204 understanding the trial at which he is being tried is, in effect, absent from that trial.
However, we do not agree with Suarez that the state or the court has a duty to do anything more than provide him with a competent interpreter. Appellant relies on the court's discussion of waiver of the right to an interpreter in Negron:
The least we can require is that a court, put on notice of a defendant's severe language difficulty, make unmistakably clear to him that he has a right to have a competent translator assist him, at state expense if need be, throughout his trial.
Id. at 390-91 (footnotes omitted). Suarez argues that this statement reflects a judicial duty to personally inform a defendant of his right to simultaneous translation at trial, and that only after such record notice to the defendant can the defendant waive the right. See also State v. Neave, 117 Wis.2d 359, 344 N.W.2d 181 (1984) (right to interpreter waivable only by defendant personally, and not by defendant's attorney). We note, though, that the court in Negron was confronted with a trial where "[t]he times during pre-trial preparation and at trial when translation made communication possible between Negron and his accusers, the witnesses, and the officers of the court were spasmodic and irregular" because an interpreter was only intermittently available to the defendant. 434 F.2d at 388. In Neave the defendant never had an interpreter but counsel had never requested one, and the question before that court therefore was whether failure of defense counsel to request an interpreter constituted a valid waiver of the defendant's right to an interpreter. Thus, while these cases may be correct in requiring a personal on-the-record notification by the court to the defendant of his right to have an interpreter, we do not find in a case such as the one sub judice that, once provided an interpreter, the court has a further obligation to solicit a record waiver from the defendant of the right to simultaneous translation.
We are persuaded by the reasoning of the court in Markiewicz v. State, 109 Neb. 514, 191 N.W. 648 (1922), wherein, as in this case, an interpreter was appointed by the court for the defendant at trial but that interpreter, through no action of the state or the court, failed to provide simultaneous translation of the trial to the defendant. The court wrote:
Though the court must afford the defendant full opportunity to obtain all the benefit of this constitutional right [to confront witnesses] and, to that end, to understand testimony of the witnesses against him, so that a proper cross-examination may be had, we know of no affirmative duty devolving on the court to see that the defendant does have interpreted to him everything that is said and done, as it occurs, during the progress of the trial. The court in this case surely performed its full duty of preserving to the defendant his rights in that regard by appointing the interpreter selected by the defendant, an interpreter who was admittedly competent, and who was appointed for the declared purpose of interpreting and explaining to the defendant all of the things said and done during trial. The defendant and his attorney were furnished the means by which the defendant could be fully apprised with knowledge of the proceedings and the course of the testimony, and it was for them to determine how far they should avail themselves of the services of the interpreter furnished. The defendant having been actually confronted by the witnesses face-to-face as they gave their testimony, and having been given the means and a fair opportunity to understand what they said, and of preparing himself, through his attorney, to have the witnesses properly cross-examined, certainly has been denied no constitutional right, from the mere fact that the court did not, as the evidence was introduced, watch over and require the interpreter to constantly translate to the defendant all that was being said.
109 Neb. at 520-21, 191 N.W. at 650-1.
Suarez does not claim that he was at any time deprived of access to the court-appointed interpreter or that attempts to provide simultaneous translation were thwarted *1205 either by the court, the state, or defense counsel. We will not speculate as to what conditions would require the court to assist the defendant in receiving simultaneous translation, but we find no abuse of discretion in the record before us. See generally Annot., 36 A.L.R.3d 276 (1971).

GUILT PHASE

a. Defendant Interview as Ethical Violation
Suarez raises two allegations of error during the guilt phase of his trial. The first allegation is based on the trial court's refusal to suppress two statements made by Suarez to an assistant state attorney. While in jail awaiting trial, Suarez on at least two occasions expressly requested to speak to state attorneys regarding his case. Suarez apparently was seeking to give exculpatory explanations for the incidents surrounding the murder. On the first occasion, Suarez was represented by a public defender, and the state attorney's office was on notice of this fact. Upon receiving the request to speak with him, an assistant state attorney, after discussing the ethical considerations involved with a superior, conducted an interview with Suarez at which another assistant state attorney provided translation for both parties. The second interview, again at Suarez's request, occurred within hours after a hearing at which defense counsel complained of the first interview. However, defense counsel at that hearing was also allowed to withdraw from the case because of conflict arising from representation of co-defendants. The record shows that the court had tentatively settled on replacement defense counsel, but no counsel had been formally appointed at the time of the second interview. The interviews were used at trial to impeach Suarez during cross-examination.
The transcripts of the two questioned interviews unmistakably show Suarez was carefully advised of his Miranda rights and his right specifically to have an attorney present during the interviews. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The record shows clear waiver by Suarez of these rights. There is absolutely no question that no constitutional error vis-a-vis Miranda required suppression of these interviews.
While no Miranda considerations required suppression of the statements, Suarez argues that violation of Florida Bar Code of Professional Responsibility, Disciplinary Rule (DR) 7-104(A)(1), requires suppression of the statements. The rule reads:
(A) During the course of his representation of a client, a lawyer shall not:
(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.
We find that the rule most definitely was violated, but that suppression is not the appropriate means by which the rule should be enforced.
Initially, we note that the state concedes that the assistant state attorney is bound by the Code of Professional Responsibility, and subject to discipline for violation thereof. In concluding that violation of the rule occurred, we must reach two questions. First, we must determine whether the rule applies in a criminal context. We agree with the Fourth District Court of Appeal in State v. Yatman, 320 So.2d 401 (Fla. 4th DCA 1975), that the rule does apply in criminal cases. The reason that this is an issue at all is because the rule seems to speak in terms of civil matters, i.e. "during the course of his representation of a client... ." However, in the context of a criminal case, the prosecuting attorney may be viewed as having as "a client" the state. Other jurisdictions have had no problem applying this rule in the criminal context. See, e.g., People v. Green, 405 Mich. 273, 274 N.W.2d 448 (1979). See also ABA Comm. on Ethics and Professional Responsibility, Informal *1206 Op. 1373 (1976) (applying DR 7-104(A)(1) in a criminal trial context).
We next address the question whether it is a violation of the rule for a prosecuting attorney to interview a defendant represented by counsel without notice to defense counsel when the defendant requests or acquiesces to the interview. Again we have no problem in finding that a violation does occur under these circumstances. United States v. Thomas, 474 F.2d 110 (10th Cir.), cert. denied, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973) (DR 7-104 violated when prosecution uses statement, at trial, taken by FBI agent during interview requested by defendant); United States v. Four Star, 428 F.2d 1406 (9th Cir.), cert. denied, 400 U.S. 947, 91 S.Ct. 255, 27 L.Ed.2d 253 (1970) ("We emphatically reiterate, however, that in-custody interrogation of an accused person known to be represented by counsel without affording the counsel an opportunity to be present is undesirable and that a prosecuting attorney who knowingly participates in such an interrogation or takes advantage of its results violates professional ethics." 428 F.2d at 1407 (citation deleted)); State v. Yatman; People v. Green.
Finally, we conclude that violation of the disciplinary rule alone does not require suppression of statements resulting from such violation. We agree with the reasoning of the Michigan Supreme Court in People v. Green:
[The principal question is] whether the voluntary statements made by the defendant after knowingly and understandingly waiving his Miranda rights, must nonetheless be suppressed solely because the assistant prosecuting attorney violated DR 7-104(A)(1).
... .
The defendant has argued that the violation of DR 7-104(A)(1) was a violation of his rights and that unless his statements are suppressed, he will have no effective remedy to redress the wrong done to him.
This argument rests upon a basic misconception of the Code of Professional Responsibility. The provisions of the code are not constitutional or statutory rights guaranteed to individual persons. They are instead self-imposed internal regulations prescribing the standards of conduct for members of the bar. Although it is true that the principal purpose of many provisions is the protection of the public, the remedy for a violation has traditionally been internal bar disciplinary action against the offending attorney. The sanctions available are by no means trivial. The attorney faces permanent disbarment. In these respects the provisions of the code are no different from the provisions found in the codes of conduct for other professions, such as medicine or architecture. They are all self-governing in-house regulations.
The admissibility of evidence in a court of law, on the other hand, is normally determined by reference to relevant constitutional and statutory provisions, applicable court rules and pertinent common-law doctrines. Codes of professional conduct play no part in such decisions.
... .
The facts in the case at bar provide a good example why a violation of Dr. [sic] 7-104(A)(1) standing alone should be dealt with by bar disciplinary action rather than by withholding relevant and material evidence from the jury.
The defendant had a story he wanted to tell to the authorities, presumably to clear himself of the murder charges lodged against him. He sent word to the authorities and asked to speak with them. He waived his Miranda rights with full knowledge of what he was doing. He specifically stated that he wanted to talk without his attorney being present. The assistant prosecuting attorney and the detective did little except listen to what the defendant had to say and take notes. The defendant's statements were completely voluntary and there was no overreaching of any kind. When asked if he were telling the whole truth, defendant said that he was. Reversal *1207 of the conviction and grant of a new trial (if in fact the witnesses and evidence presented in 1975 could be obtained for a second trial) solely because of this less than consequential violation of DR 7-104(A)(1) would constitute reprehensible "overkill."
In cases such as this, bar disciplinary action directed against the offending attorney would be a more appropriate response and would serve as a more effective deterrent than the indirect sanction of the exclusionary rule. Although the presence of a prosecuting attorney is still one factor to be considered in assessing the "totality of the circumstances" in order to determine whether a defendant's statements are constitutionally admissible, we find no unconstitutional intrusion in this factual situation.
405 Mich. at 293-95, 274 N.W.2d at 454-55 (footnote deleted).
The court in State v. Yatman likewise found no necessity to suppress a statement solely on the ground of violation of DR 7-104(A)(1). This is also the near universal result reached by other courts. See, e.g., Moore v. Wolff, 495 F.2d 35 (8th Cir.1974); United States v. Thomas, (the court sought to prohibit use of such statements prospectively and reserved deciding the question of what action to take should information arising from such interviews be used in ways other than its introduction at trial); United States v. Four Star. But see People v. Hobson, 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976) (finding constitutional prohibition against use of statements taken without notice to defense counsel, buttressing suppression and reversal with discussion of DR 7-104(A)(1) violation). The federal courts have also refused to reverse for failure to suppress statements taken by police while the defendant was represented by counsel, although the ethical violation of the prosecuting attorney in using such statements was not discussed. See, e.g., United States v. Vasquez, 476 F.2d 730 (5th Cir.), cert. denied, 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973); Wilson v. United States, 398 F.2d 331 (5th Cir.1968), cert. denied, 393 U.S. 1069, 89 S.Ct. 727, 21 L.Ed.2d 712 (1969); Coughlan v. United States, 391 F.2d 371 (9th Cir.), cert. denied, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); Mathies v. United States, 374 F.2d 312 (D.C. Cir.1967). See generally Annot., 26 A.L.R. 4th 102, §§ 10, 11 (1983).
In the absence of constitutional grounds for suppression, the only possible basis for suppression would be to discourage violation of DR 7-104(A)(1). Suppression of the statements would therefore be in the same posture as exclusion of evidence under the exclusionary rule. The exclusionary rule exists "to deter  to compel respect for the constitutional guarantee [against illegal search and seizure] in the only effectively available way  by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). The exclusionary rule thus exists because it is the only effective way to deter violations of a constitutional right. However, we have another effective way to deter violation of an ethical rule. Bar discipline can be initiated by The Florida Bar, and also may be initiated by a circuit court or a district court judge pursuant to Florida Bar Integration Rule, article XI, Rule 11.14. The goal of deterrence is therefore achieved without the "overkill" of suppression and reversal.

b. Excusing Accomplices from Testifying

Suarez next claims that the trial court abused its discretion when it allowed two co-defendants, Reyes and Sory, to refuse to testify on grounds of self-incrimination without first determining the extent and validity of their fifth amendment claims. Reyes and Sory had initially been scheduled to be tried with Suarez in the same trial. However, the trial judge severed Reyes and Sory's trial from the trial sub judice early in the proceedings. Suarez attempted to call Reyes and Sory as witnesses to support his assertion that he had acted in self-defense, apparently grounded on a theory that the police had unjustifiably used deadly force by firing their weapons *1208 at the fleeing suspects. Attorneys for Reyes and Sory objected, stating that their clients would exercise their fifth amendment privilege to remain silent. Defense counsel accepted this assertion as to Sory, but requested that Reyes' attorney consult with his client. Reyes' attorney briefly consulted with his client and assured the court that he would invoke his fifth amendment privilege. Defense counsel requested that the jury be advised that these witnesses had been called and that they had refused to testify. This the court declined to do. No request for a record voir dire was made.
It is well settled that a person is normally exempt from answering questions which may directly or indirectly incriminate him. State ex rel. Benemovsky v. Sullivan, 37 So.2d 907 (Fla. 1948). However, the matter of deciding what answers may be incriminating is not solely up to the witness, but is one requiring the exercise of the trial court's discretion. State ex rel. Mitchell v. Kelly, 71 So.2d 887 (Fla. 1954). Suarez urges us to conclude that in order for the court to properly exercise its discretion, it must conduct an on the record voir dire to determine the extent to which the fifth amendment privilege applies. Appellant relies on the case of Faver v. State, 393 So.2d 49 (Fla. 4th DCA 1981). In Faver, a voir dire inquiry was made of a witness outside the presence of the jury at which the witness refused to answer all questions after giving his name and address. Obviously, voir dire of such a witness is one way for the court to ensure that a witness is properly excluded when he elects to invoke his fifth amendment privilege. However, the question before the court in Faver was not whether a voir dire was required. We can find only one case where this question was directly before a Florida court, and we agree with the decision in that case, that voir dire is not required when it would constitute "an idle exercise of judicial labor to indulge in such inquiry." Lopez v. State, 349 So.2d 1198, 1199 (Fla. 2d DCA 1977), cert. denied, 359 So.2d 1216 (Fla. 1978).
The facts in the Lopez case are nearly identical to those here. Lopez sought to call his co-defendant, who, as in this case, had been charged in the same indictment as the defendant and who also was subject to trial subsequent to the trial of the complaining defendant. The co-defendant's counsel stated that his client would refuse to answer any questions on fifth amendment grounds. The co-defendant was never voir dired before the court and on appeal the defendant complained that the trial judge incorrectly allowed co-defendant's counsel to be the judge of whether the co-defendant should testify. The Second District Court of Appeal wrote:
We agree with appellant that ordinarily the trial judge initially must make a direct inquiry on voir dire to determine a witness' claim of privilege. In the determination of this threshold question a witness who claims the privilege against self-incrimination has the burden of establishing his entitlement and this, of course, ... is a matter for the court to determine. Under the circumstances here, however, it would have been an idle exercise of judicial labor to indulge in such inquiry. The facts before the court, and patent from the four corners of the case at the critical posture involved, clearly supported the court's conclusion that [the co-defendant] was entitled to the Fifth Amendment privilege against self-incrimination. It was not error to forego the voir dire examination which, under other circumstances, may ordinarily have been required.
Id. at 1199-1200. The district court noted that the defendant could have established a predicate to compel testimony "under appropriate safeguards devised within the discretion of the trial judge sufficient to insulate the witness from the incriminating effects of what he may be compelled to say." Id. at 1200. This apparently would have occurred had defense counsel demanded and conducted a voir dire. No such voir dire was requested in Lopez or in the instant case. Absent a grant of immunity, we can conceive of no way in which the co-defendants could have given useful information *1209 without incriminating themselves, because they would have had to admit their presence at the scene of the murder. Defense counsel may well have had the right to insist on a voir dire, but it was not the trial court's obligation to conduct one, absent a defense request.

PENALTY PHASE
Suarez next claims that the trial court erred in instructing the jury at the penalty phase on aggravating circumstances which have been held to constitute "doubling." Specifically, the trial judge instructed the jury on the aggravating circumstances that the murder occurred in commission of a robbery and that the crime was committed for pecuniary gain, and that the murder was committed to avoid arrest and committed to hinder the exercise of law enforcement. These two pairs of aggravating circumstances have been held to constitute improper doubling in Provence v. State, 337 So.2d 783 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977), and White v. State, 403 So.2d 331 (Fla. 1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983), respectively. However, Provence and White regarded improper doubling in the trial judge's sentencing order, and did not relate to the instructions to the penalty phase jury. The jury instructions simply give the jurors a list of arguably relevant aggravating factors from which to choose in making their assessment as to whether death was the proper sentence in light of any mitigating factors presented in the case. The judge, on the other hand, must set out the factors he finds both in aggravation and in mitigation, and it is this sentencing order which is subject to review vis-a-vis doubling.
Appellant finally attacks five aspects of the sentencing order of the trial judge. First, he claims that the aggravating factor of knowingly creating a great risk of death to many persons is not supported in the record. The defendant notes that only three deputies beside the victim were in the line of fire during the shooting by appellant, and that the presence of three others plus a victim is insufficient to establish this aggravating circumstance. Johnson v. State, 393 So.2d 1069 (Fla. 1980), cert. denied, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981) (three persons besides victim present in store at time of shoot out). The state argues that the high speed chase and the risks attendant thereto support the aggravating circumstance here. However, we do not have to decide whether events leading up to the fatal incident can be considered, for we find sufficient evidence absent the chase. The record shows that Suarez fired in the area of a migrant labor camp, and that his accomplices were also present at the time. Although there is no evidence that the police fired their weapons, this seems more an act of providence, in that they were unable to spot the precise location of defendant's shooting position. This aggravating factor is adequately supported in the record.
Suarez next complains that the aggravating factors that the murder was committed while in flight from committing a robbery and committed for purposes of avoiding lawful arrest are "doubled" because they refer to the same aspect of appellant's conduct. There is sufficient distinct proof as to the two aggravating factors. Appellant was fleeing from a robbery and, once brought to ground by deputies, attempted to avoid arrest by firing his weapon. While there may well be some overlap on these two factors it is not a complete doubling and, in any event, the sentencing process is not a mere mathematical exercise of counting up aggravating circumstances. Sufficient distinct facts support and make relevant both these aggravating circumstances.
Suarez next complains that mention of lack of remorse in the trial court's sentencing order constituted an improper consideration of a non-statutory aggravating circumstance. The complained of reference to lack of remorse is found in the "Conclusion of Court" which follows the point-by-point analysis of aggravating and mitigating circumstances:

*1210 There are sufficient and great aggravating circumstances which exist to justify the sentence of death. Indeed the actions of the Defendant show a total disregard for the rights and safeties provided by our laws and constitutions to the citizens of this State. His only profession is that of an outlaw and his only response to any provocation is to kill. The Court truly believes that this Defendant has nothing but hate and distrust for any law enforcement agency or officer and that he really does not feel any remorse or misgivings for taking the life of Deputy Howell. His only concern is that he did not succeed and make good his scheme of Robbery and Murder. The Defendant is deserving of no other sentence but death.
It is thus apparent that the mention of lack of remorse comes after the judge concluded that there were sufficient and great aggravating circumstances existing to justify the sentence of death. The balancing and weighing had already been done. Lack of remorse merely constituted an observation and expression of opinion and philosophy by the trial judge after sufficient aggravating circumstances had been found.
Finally, Suarez complains that the trial court found no mitigating factors when it should have done so. The trial court is not obliged to find mitigating circumstances. Porter v. State, 429 So.2d 293 (Fla.), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).

CONCLUSION
Accordingly, the conviction and sentence of the defendant are affirmed.
It is so ordered.
BOYD, C.J., and ADKINS, OVERTON, McDONALD and SHAW, JJ., concur.
EHRLICH, J., concurs with an opinion, in which OVERTON and SHAW, JJ., concur.
EHRLICH, Justice, concurring.
I concur with the Court's opinion. However, I am constrained to comment on one aspect of the case.
The Court found that an assistant state attorney violated Florida Bar Code of Professional Responsibility, Disciplinary Rule (DR) 7-104(A)(1) by interviewing defendant, at the latter's request, and taking a statement from him during the time he was being represented by the public defender, without notice to defense counsel. The Court, while mentioning that bar discipline is the effective way to deter violation of an ethical rule, has, quite properly in my opinion, pursued it no further.
Without endeavoring to prejudge the episode, I do think it should be the subject of investigation by The Florida Bar, or the circuit court trial judge should direct the state attorney for the circuit in which the subject attorney shall have his office, to proceed pursuant to Florida Bar Integration Rule, article XI, Rule 11.14. It may very well be that one of these procedures has already been undertaken. I address these remarks only because I do not believe this matter should be ignored by those who are initially responsible for maintaining discipline within The Florida Bar.
OVERTON and SHAW, JJ., concur.
NOTES
[1] Another court has noted:

There are three principle reasons why a non-English speaking criminal defendant needs an interpreter: (1) To translate during the defendant's testimony if he takes the stand; (2) to facilitate communication between the defendant and his English speaking attorney; (3) to enable the defendant to reasonably understand the trial proceedings conducted in English.
State v. Neave, 117 Wis.2d 359, 362 n. 2, 344 N.W.2d 181, 183 n. 2 (1984).