560 So.2d 223 (1990)
Darrell Wayne HALLMAN, Appellant,
v.
STATE of Florida, Appellee.
No. 70761.
Supreme Court of Florida.
April 12, 1990.
*224 James Marion Moorman, Public Defender, and Steven L. Bolotin, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., and Robert J. Landry, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Darrell Wayne Hallman appeals from a sentence of death imposed by a trial court that overrode a jury's recommendation that he be sentenced to life in prison. We have jurisdiction under article V, section 3(b)(1), Florida Constitution.
In October 1986, Hallman took a taxi cab to a federal savings and loan bank in Lakeland. When he arrived, he told the cab driver to accompany him into the bank, as he was planning a robbery. Inside, he held a gun on a teller and had her fill up a grocery sack with money. He then left, telling the taxi driver to stay in the bank. After Hallman had left, a teller yelled outside to the security guard, Lewis Hunick, that there had been a robbery and that Hunick should try to get the license number of the getaway car. The guard ran toward the cab.
Hallman, meanwhile, had discovered that the cab driver had the ignition key. He went back to the front door, but the teller had locked it, so he headed back for the taxi. As he approached the cab, he encountered Hunick. Hallman said he felt if he ignored the guard, he would leave him alone. As he reached the driver's door, however, Hunick, standing behind the right rear bumper, fired at him through the cab's rear window. Hunick missed, but glass from the left rear door window was blown onto Hallman, who fired back twice. One shot struck Hunick in the chest, and he fell, mortally wounded. Hallman walked around the cab and observed Hunick on the ground. Hallman then started to leave, but as he did Hunick raised up and fired his remaining shots. One bullet struck Hallman in the lower back and exited through his abdomen. Hunick apparently lapsed into unconsciousness shortly afterwards and was clinically dead when he arrived at the hospital.
Hallman set off on foot, but soon commandeered a passing car and forced the driver to take him from the scene. After *225 riding for several miles, Hallman had the driver stop the car and get out. He then drove the car several more blocks before abandoning it and walking to a trailer park where his sister lived. A neighbor who had heard a radio report of the robbery noticed that Hallman was acting suspiciously and notified police. Hallman was captured without a struggle.
A grand jury indicted Hallman with one count of first-degree murder, two counts of kidnapping, and two counts of robbery. At trial a jury found him guilty on the murder count, both kidnapping counts, one robbery count (the bank), and of the lesser included offense of grand theft on the other robbery count.
During the penalty phase the state introduced evidence that Hallman had previously been convicted of armed robbery and that he was still on parole and argued that there were six aggravating factors present: Hallman was under a sentence of imprisonment; Hallman was previously convicted of a felony involving the use or threat of violence (armed robbery); the killing was committed to avoid lawful arrest; the killing was committed during flight from an armed robbery; the killing was especially heinous, atrocious, or cruel; and Hallman created a great risk of death to many persons. Hallman introduced considerable testimony concerning his family background, including severe abuse at the hands of his father; his exemplary work record; his good disciplinary record in prison; his record on parole; his good character; and the pressures that were affecting him at the time of the killing. He also testified about the killing and the robbery, saying he fired in reaction to the guard's shooting at him. Counsel argued to the jury that the killing was not the type for which the death penalty was intended. The jury recommended life imprisonment.
The trial court rejected the jury's recommendation and imposed the death penalty. The judge found that the state had proved all six of the aggravating circumstances it had argued, found there were no statutory mitigating circumstances present, and concluded that the nonstatutory mitigating factors did not outweigh the aggravating circumstances.
Hallman does not challenge the guilty verdicts[1] but does attack the sentence. Several of his points merit discussion.
First, Hallman says the court improperly found the aggravating factor of especially heinous, atrocious, or cruel. Hallman notes that Hunick was killed with a single shot to the chest and that death probably occurred within a matter of a few minutes. Hallman maintains that this aggravating circumstance is normally reserved for killings where victims were tortured or forced to contemplate the certainty of their deaths. Finally, he notes that Hallman fired in response to Hunick's shots at him, and while he could have "executed" the victim  Hallman had three shots remaining  chose to walk away from him.
We agree that the circumstances of this case do not support the finding that the killing was especially heinous, atrocious, or cruel. While "[i]t is apparent that all killings are atrocious," Tedder v. State, 322 So.2d 908, 910 (Fla. 1975), for a murder to be considered especially heinous, atrocious, or cruel there must be "such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim." State v. Dixon, 283 So.2d 1, 9 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). The evidence at trial supported Hallman's version of the shooting, that he fired two shots in rapid succession, in response to Hunick's opening fire. Hallman did nothing to increase or prolong Hunick's suffering.
Next Hallman attacks the finding that he knowingly created a great risk of death to many persons. The trial court listed ten persons who were in the area of *226 the shoot-out and could have been struck and remarked that the shoot-out occurred near a busy thoroughfare. Hallman argues that he and Hunick fired at each other from close range and that none of the bullets was aimed in the direction of a large number of people. At most, he maintains, there was only the chance that a bystander would be struck by a stray shot, and that such a danger is insufficient to support the aggravating circumstance.
Again, we agree with Hallman. We set out the standard for this aggravating circumstance in Kampff v. State, 371 So.2d 1007 (Fla. 1979). We said:
"Great risk" means not a mere possibility but a likelihood or high probability. The great risk of death created by the capital felon's actions must be to "many" persons. By using the words "many," the legislature indicated that a great risk of death to a small number of people would not establish this aggravating circumstance.
Id. at 1009-10. We have held that great risk of death to three people was insufficient. Bello v. State, 547 So.2d 914 (Fla. 1989). The state's reliance on Suarez v. State, 481 So.2d 1201, 1209 (Fla. 1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2908, 90 L.Ed.2d 994 (1986), is misplaced. In that case the defendant fired more than a dozen shots in the area of a migrant labor camp, three persons other than the victim were in the line of fire, and his four nearby accomplices ran the risk of death from return fire.
The trial judge referred to the presence of numerous people in the bank, five bystanders outside the bank, and passersby on busy U.S. 98 to support his finding. The evidence showed, however, that the seven persons in the bank ran almost no risk of being struck, as they were behind partitions and away from doors or windows and not in the line of fire. Five of the witnesses outside the bank either saw or heard the shooting, but only one of them was ever in the line of fire. It is true that there were a number of passersby on U.S. 98, but of the eight shots only one was definitely aimed in the direction of the highway and only two others could have been.[2] We do not believe that the possibility that no more than three gunshots could have been fired toward a busy highway is proof beyond a reasonable doubt that Hallman knowingly created a great risk of death to many persons.
Four valid aggravating factors remain, however, so we must examine the evidence in mitigation. Our focus when the judge has overridden a life sentence recommendation is on the reasonableness of the jury's recommendation. In the leading case of Tedder v. State, 322 So.2d 908, 910 (Fla. 1975), we said "the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Looked at another way, the inquiry is whether there is any reasonable explanation for the jury's life recommendation.
We believe there is, though we agree with the trial judge that none of the statutorily enumerated mitigating circumstances applied. Hallman produced considerable testimony regarding nonstatutory mitigation, for which the jury may consider any other aspect of the defendant's character or record or any other circumstance of the offense.
While no single facet of Hallman's penalty phase evidence was particularly compelling, there was sufficient testimony to support the defense position that Hallman was a man with many good qualities but who was given to appalling errors of judgment when he was under stress.[3] Most significantly, the jury reasonably could have *227 found that Hallman should be spared because of the circumstances of the shooting: Hallman fired in reaction to Hunick's shots, and after he saw Hunick was disabled did not fire again, even after he had been shot.
Further, the jury may well have decided that, although four aggravating factors were proved, some were entitled to little weight. For example, Hallman's unrebutted testimony was that his role in the previous armed robbery for which he was convicted was to act as lookout while the ringleader and another accomplice ransacked the cash registers in a drug store. When the police came, summoned by a silent alarm, Hallman tried to ignore the officers in the hope they would go away. Again, he was taken without a struggle. Further, the fact that he was on parole was itself mitigated by the fact that he had done very well with his parole until his DUI. Finally, the jury may have considered Hallman's blemish-free record as an inmate.
We conclude that the trial court did not give the jury's recommendation the great weight that Tedder requires. Because there was evidence from which a reasonable juror could have concluded that death was not an appropriate penalty, the trial judge should have adopted the recommendation. Therefore, we vacate the sentence of death and commute Hallman's sentence on the murder count to life in prison without parole for twenty-five years.
There are two issues regarding sentencing on the noncapital offenses.
First, the trial judge departed from the guidelines and ordered three consecutive life sentences for the two kidnappings and the robbery and a consecutive five-year term for the grand theft conviction. He gave four reasons for departing from the presumptive guidelines sentence of twenty-two to twenty-seven years:
1. Defendant induced a minor (Scott Anderson) to participate in acts of juvenile delinquency, to-wit: taking or stealing a firearm from his parents.
2. The offense for which defendant was sentenced was committed in a premeditated, calculated and preplanned manner without pretense of moral or legal justification.
3. In committing the offenses for which defendant was sentenced he knowingly created a great risk of injury or death to a large number of persons.
4. Defendant committed the offense for which he was sentenced for the purpose of avoiding or preventing lawful arrest or effecting an escape, to-wit: armed kidnapping, grand theft, first-degree murder.
The first reason is invalid because it involves a separate crime, contributing to the delinquency of a minor, for which Hallman was not charged. Florida Rule of Criminal Procedure 3.701(d)(11) proscribes departures for "factors relating to the instant offense for which convictions have not been obtained."
An analysis of the second reason is troublesome. While many crimes can be said to be premeditated, there are only a few which are so carefully planned and executed as to warrant an extraordinary sentence. This Court upheld a departure in two cases in which the records disclosed an unusually high degree of premeditation. Casteel v. State, 498 So.2d 1249 (Fla. 1986); Lerma v. State, 497 So.2d 736 (Fla. 1986), receded from on other grounds, Rousseau v. State, 509 So.2d 281 (Fla. 1987). The evidence in the instant case falls far short of justifying a departure for premeditation. A mere recitation of the facts illustrates Hallman's lack of foresight in perpetrating these crimes.
The third reason can be valid. Webster v. State, 500 So.2d 285 (Fla. 1st DCA 1986); Staten v. State, 500 So.2d 297 (Fla. 2d DCA 1986), disapproved on other grounds, 519 So.2d 622 (Fla. 1988). However, the sentence for murder is not under the guidelines, and there is no evidence that any of the other crimes exposed anyone to great risk of injury or death. Therefore, it is invalid under the facts of this case.
The validity of the fourth reason has apparently never been considered by the appellate courts of this state. The *228 legislature has determined that avoiding arrest is an aggravating factor to be considered in imposing a sentence for first-degree murder. § 921.141(5)(e), Fla. Stat. (1989). We see no reason why it should not also be a valid reason for departure from the sentencing guidelines. Further, the fact that the second kidnapping and the car theft were committed to effect an escape is a valid basis for departure where, as here, Hallman was never in custody and, therefore, did not commit a separate crime of escape.
While the legislature has now determined that any valid reason justifies departure, the principle of Albritton v. State, 476 So.2d 158 (Fla. 1985), is applicable to Hallman's crimes. State v. McGriff, 537 So.2d 107 (Fla. 1989). In this instance, we are convinced beyond a reasonable doubt that the absence of the invalid reasons would not have affected the departure sentence.
Finally, there is the matter of the trial court's retaining of jurisdiction over the first one-third of Hallman's sentence. Insofar as this might apply to the capital offense, it effectively is moot because Hallman will be ineligible for parole for at least twenty-five years. As to the other counts, they are governed by the sentencing guidelines, under which there is no parole. Therefore, section 947.16, Florida Statutes (1985), authorizing retention of jurisdiction in order to limit parole is inapplicable. Roseman v. State, 497 So.2d 986 (Fla. 5th DCA 1986); Carter v. State, 464 So.2d 172 (Fla. 2d DCA), affirmed, 479 So.2d 117 (Fla. 1985). We strike down that part of the judge's order purporting to retain jurisdiction.
Hallman's conviction of first-degree murder is affirmed. His death sentence is vacated and a sentence of life imprisonment without parole for twenty-five years is imposed. The remaining four noncapital convictions and sentences are affirmed. That part of the sentencing order that purports to retain jurisdiction is reversed.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] The evidence of guilt was overwhelming, and our review of the record revealed no error in that phase of the trial.
[2] One shot hit Hallman, one hit Hunick, and at least three others lodged in the taxi.
[3] In the weeks leading up to the crime Hallman's life had been in upheaval. First, his wife had filed for divorce and he had moved out; Hallman was close to her son, and the separation bothered him. Then his father-in-law, with whom he was very close, had died after a lingering illness. Hallman had visited his father-in-law frequently during the man's illness. Finally, he had wrecked his truck and been arrested for driving under the influence. The lack of transportation cost him his job and the DUI charge threatened his parole.