809 So.2d 43 (2002)
Ernest CADET, Appellant,
v.
STATE of Florida, Appellee.
No. 4D00-3563.
District Court of Appeal of Florida, Fourth District.
February 6, 2002.
*44 Michael S. Goodman, Miami, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Maria J. Patullo, Assistant Attorney General, West Palm Beach, for appellee.

ON MOTION FOR REHEARING
STEVENSON, J.
We deny the motion for rehearing, but withdraw the previous opinion and substitute the following in its place.
The appellant, Ernest Cadet, was tried by jury and convicted of capital sexual battery and battery. The victim of his crimes was V.G., the five-year-old daughter of a friend. On appeal, Cadet seeks to reverse his convictions on the grounds that (1) the trial court failed to ensure that the interpreter remained in the courtroom throughout the trial and (2) the trial court abused its discretion in allowing the victim's sister to testify that the defendant had made lewd sexual advances toward her as well. We affirm on both points.

The Translator's Absence from Trial
Cadet, who is originally from Haiti, first complains that he was entitled to have a Creole translator present throughout the lower court proceedings and that the translator's absence entitles him to reversal and a new trial. At the beginning of the proceedings and before defense counsel arrived in court, the following discussion took place:
Court: Mr. Cadet, do we need an interpreter or anything for him?
Bailiff: Got one right here.
Court: Very good. We appreciate you being here. He needs limited assistance. The work for you may be somewhat lighter, I hope. All we need now is to have Mr. Garcia [defense counsel] join us.
After a short break, defense counsel arrived and the trial proceeded. The interpreter apparently left during the break and defense counsel raised no issues to the trial judge concerning Cadet's need for an interpreter.
Later, during the sentencing hearing, the following exchange took place:
Court: Are we ready for sentencing?
D Cnsl: Yes.
Court: And do we need an interpreter?
D Cnsl: Your Honor, there is an interpreter but Earnest [Cadet] speaks English. Come on up, Earnest.
Court: Okay.
Then, when the judge gave Cadet the opportunity to address the court, the following transpired:
Court: All right, Mr. Cadet, having been adjudicated guilty, there is an interpreter present, if you desire him, but on your lawyer's representation that you are comfortable in English, we will proceed....
Using the interpreter, Cadet responded:
The reason why I need an interpreter because that when I went to the judgment, I know that I am innocent and I didn't know what was going on and they told me that I was not guilty and I know that I was not guilty, although the lawyer told me, I didn't, I didn't know what *45 was going on and that they found me guilty and I didn't understand what was going on. That's why I have never spoken to him.
Defense counsel then chimed in, stating:
We need to stop right now. I think we need to continue this sentencing here and order transcripts of what initially took place in regards to whether or not Mr. Cadet wanted a translator because this is just absurd that he is now accusing me, at this present time, that he had absolutely no idea what was going on.
The trial judge reset the sentencing hearing.
When the court reconvened about a month later, defense counsel admitted that he had been unable to find transcripts reflecting that Cadet had expressly waived his right to an interpreter:
[T]here was never a dissertation between the Court, myself and Mr. Cadet in regard to his command of the English language; however, there are numerous letters in the file which are written in English, written in very good English and his stance and the reason as to why he should be given a new trial.
Defense counsel went on to state that Cadet was having difficulty understanding the Williams rule issues that had arisen during trial, but defense counsel did not attribute that to "his lack of knowledge of the English language." Later, during the sentencing hearing, defense counsel told the trial judge that he had numerous meetings with Cadet and never had any problems communicating with him. Thereafter, the judge imposed sentence.
The right of a defendant to have the assistance of an interpreter at trial was recently addressed in Tehrani v. State, 764 So.2d 895, 898 (Fla. 5th DCA 2000), review denied, 789 So.2d 349 (Fla.2001):
A non-English speaking defendant has the right to an interpreter, a right grounded on due process and confrontation considerations of the Constitution. Suarez v. State, 481 So.2d 1201 (Fla. 1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2908, 90 L.Ed.2d 994 (1986). The right is not necessarily waived by the failure to assert it, since a defendant's inability to understand the language may be the cause of the failure to assert his rights. State v. Neave, 117 Wis.2d 359, 344 N.W.2d 181 (1984), approved in Suarez, 481 So.2d at 1204. Once the trial court is aware that an accused has difficulty with the English language, the court should determine whether a defendant understands English sufficiently to aid in his defense, much as the court has a duty to determine whether a defendant is mentally competent. 344 N.W.2d at 188.
The State argues that Cadet, through defense counsel, waived the right to an interpreter. Although the right to an interpreter may be waived, see Monte v. State, 443 So.2d 339, 342 (Fla. 2d DCA 1983), we cannot find an express waiver on this record. Indeed, Suarez approvingly cited Neave for the proposition that the "right to [an] interpreter [is] waivable only by defendant personally, and not by defendant's attorney." Suarez, 481 So.2d at 1204. Nevertheless, we affirm since the record is clear that at the beginning of the proceedings here, the trial judge made the interpreter available to Cadet. Because it was readily apparent that Cadet had at least some command of the English language, the court was under no obligation to constantly monitor the use which Cadet and his counsel made of the interpreter. As for the apparent disagreement between Cadet and defense counsel on the issue of the use of or need for the interpreter, as in Tehrani, where counsel consistently failed to assert the defendant's right to an interpreter, *46 we believe that "[t]his is an issue more appropriately addressed in a postconviction proceeding." 764 So.2d at 896.

Collateral crimes evidence
Next, Cadet challenges the trial court's evidentiary ruling permitting the victim's sister, A.G., to testify about sexual advances that Cadet made toward her. The trial court's ruling on the admissibility of this collateral crime evidence is reviewed for an abuse of discretion. See Reed v. State, 783 So.2d 1192, 1195 (Fla. 1st DCA 2001). Generally, the rules controlling the admissibility of collateral crimes evidence in criminal cases are found in the Florida Evidence Code, Florida Statutes Chapter 90.[1] In a trilogy of cases, the Florida Supreme Court adopted special rules and standards for the introduction of collateral crimes evidence in cases involving the sexual abuse of a child. See Heuring v. State, 513 So.2d 122 (Fla. 1987); State v. Rawls, 649 So.2d 1350 (Fla. 1994); Saffor v. State, 660 So.2d 668 (Fla. 1995). The court explained in Saffor, the most recent of these cases, that as the law has evolved in child sex abuse cases, similar fact evidence is admissible to corroborate the victim's testimony if the collateral offense and the charged offense are "strikingly similar" and "share some unique characteristic or combination of characteristics which sets them apart from other offenses." 660 So.2d at 671. When the defendant and the victim of both the charged offense and the collateral offense stand in a familial relationship, while there still must be an additional showing of similarity,
the strict similarity in the nature of the offenses and the circumstances surrounding their commission which would be required in cases occurring outside the familial context is relaxed by virtue of the evidence proving that both crimes were committed in the familial context.
Id. at 672.
The State asserts on appeal that the defendant and these victims stood in a familial relationship, pointing to the longtime friendship between the victims' father and the defendant and the assistance that the defendant provided the family when they moved to the United States from Haiti. This issue, however, was not addressed during the proceedings below. On appeal, we find it unnecessary to resolve the issue as we conclude that, even absent the existence of a familial relationship, the charged offense and the collateral offense were sufficiently similar to sustain the trial court's admission of the collateral crimes testimony.
The victims' father testified that he had known the defendant for fifteen to twenty years and, when he moved his family to the United States from Haiti, he sought out Cadet. The father added that Cadet had been a great help to the family, doing things like taking them to the doctor and translating. In fact, at the time of the abuse, the victims' father and Cadet worked together. The record contains much evidence concerning the relationship of Cadet with the victims' father, but little of Cadet's prior relationship and contact with the victims themselves. At best, it appears that the victims merely accepted, and respected, Cadet as their father's friend.
V.G., the victim of the charged offense, testified that she was five or six years of *47 age at the time of the first incident. According to V.G., she was in front of a neighbor's house playing when Cadet pulled up and called her over to his car. After discovering that her father was at work, Cadet asked V.G. to get into his car. V.G. complied. V.G. explained that Cadet asked her if her mother had fed her with a bottle and that she did not understand what he meant. According to V.G., Cadet then unbuckled his pants and directed her to put her face down by his pants and to put her mouth on what she called his "privacy." V.G. stated that she did as told and that Cadet then told her not to tell anyone. After the incident, Cadet gave V.G. a piece of candy in hopes of securing her silence.
The second incident occurred when V.G. was nine. This time V.G. and her uncle were on their way to pick up her father from work when the car broke down. The pair walked to her father's place of employment. V.G.'s father than asked Cadet to drop him off at the broken-down car and to take his daughter home. V.G. testified that after they dropped her father off, Cadet instructed her to get in the front seat. V.G. explained that she had a pair of shorts on underneath her pants and that Cadet commented that "it looks tight" and that she should take her pants off. V.G. stated that she pulled her pants half way down, but then pulled them back up. Cadet stopped the car across from V.G.'s school and again instructed her to pull her pants down. V.G. testified that Cadet then tried to touch her "privacy," but managed only to touch the lower part of her stomach. She insisted that Cadet take her home and, this time, she told her sister about the incident.
As for the collateral crime, V.G.'s older sister, A.G., testified that Cadet made sexual advances toward her on her fifteenth birthday. A.G. testified that on March 20, 1998, her birthday, she asked her parents to take her shopping and, when they indicated that they could not, Cadet was called and asked to take her. A.G. stated that after Cadet picked her up, he took her to the park instead of the mall. A.G. testified that when they got to the park, Cadet began to tell her how much he liked her and that he wanted her to be his girlfriend. According to A.G., Cadet unzipped his pants and began touching himself and asking her to touch him. A.G. stated that she told him to stop and that, eventually, he did, asking her not to tell her parents and promising to buy her something at the mall. Later, at the mall, Cadet made good on his promise to purchase something for A.G.
In cases involving collateral sex offenses, or Williams rule evidence, the similarity of the offenses must be determined on a case-by-case basis, considering their nature and the circumstances surrounding them. See Saffor; Rawls. Here, the testimony of the victims establishes that although the two victims were not precisely the same age, they were both young and vulnerable daughters of a close friend of Cadet. Cadet's trusted, nearly familial relationship with the victims' father provided him with the opportunity to gain access to, and time alone with, the young victims. On the relatively rare instances when Cadet found himself alone with these girls, Cadet made lewd sexual advances and told them not to tell, using candy and gifts as tools of bribery. The trial judge noted that, although the offenses were "somewhat at variance," the law did not require that they be "exactly the same." The trial judge then concluded that these crimes met the test for admission under the Williams rule. We cannot say that the trial judge abused his discretion in allowing *48 these collateral offenses into evidence. Consequently, we affirm.
AFFIRMED.
STONE, J., and CLARK, NIKKIANN, Associate Judge, concur.
NOTES
[1] Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

§ 90.404(2)(a), Fla. Stat. (2000).